PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

CHRISTOPHER A. SCIOLINO,
   *Plaintiff-Appellant,*

v.

CITY OF NEWPORT NEWS, VIRGINIA;
DENNIS A. MOOK, Individually and
as Chief of Police for the City of
Newport News,
   *Defendants-Appellees.*

No. 05-2229

Appeal from the United States District Court
for the Eastern District of Virginia, at Newport News.
Raymond A. Jackson, District Judge.
(CA-04-68-4)

Argued: November 28, 2006

Decided: March 12, 2007

Before WILKINSON, MOTZ, and GREGORY, Circuit Judges.

---

Vacated and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Gregory joined. Judge Wilkinson wrote a dissenting opinion.

---

## COUNSEL

Thomas Allan Dyar, LAW OFFICE OF REID H. ERVIN, P.C., Norfolk, Virginia, for Appellant. R. Johan Conrod, Jr., KAUFMAN & CANOLES, P.C., Norfolk, Virginia; Allen Link Jackson, Chief Dep-

uty City Attorney, CITY ATTORNEY'S OFFICE FOR THE CITY OF NEWPORT NEWS, Newport News, Virginia, for Appellees.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

A former probationary city police officer brings this action pursuant to 42 U.S.C. § 1983 (2000). He asserts that when discharging him, the city placed in his personnel file false information damaging to his good name without granting him a name-clearing hearing, and so deprived him of liberty rights without due process of law. Because the former employee did not allege facts asserting a likelihood that prospective employers or members of the public would see the damaging information, the district court did not abuse its discretion in dismissing the employee's complaint. However, when the district court denied the employee's motion to amend his complaint in order to meet this standard, the court did abuse its discretion. Accordingly, we vacate the judgment and remand for further proceedings consistent with this opinion.

I.

In May 2002, the Newport News Police Department hired Christopher Sciolino as a police officer. Sciolino began an eighteen-month probationary period during which he was not entitled to any departmental grievance rights. On June 26, 2003, the Acting Chief of Police Carl Burt placed Sciolino on administrative duty, asserting that Sciolino had advanced the odometer of his police cruiser approximately 10,000 miles, ostensibly to get a new car sooner. Sciolino denied these charges. On September 26, 2003, Chief of Police Dennis Mook, acting on behalf of the department, terminated Sciolino's employment by letter, accusing him of deliberately destroying city property by advancing the odometer. Sciolino alleges that the department placed the letter in his personnel file.

On June 2, 2004, Sciolino brought this action against the City of Newport News and Chief Mook (in both his individual and official

capacity). The City and Chief Mook (hereafter collectively "the City") moved to dismiss Sciolino's first amended complaint for failure to state a claim. The district court granted the motion, holding that in order to give rise to a due process claim, a plaintiff must allege facts asserting that damaging and false charges in his personnel file were likely to be disseminated to prospective employers or members of the public.

After dismissal, Sciolino moved to file a second amended complaint, assertedly to satisfy this standard. The district court denied Sciolino's motion to amend. Sciolino appeals both the order dismissing the case, and the order denying his motion to file an amended complaint.

## II.

Sciolino contends that by placing false charges in his personnel file, which "may be available" to prospective employers, the City deprived him of Fourteenth Amendment liberty interests — in his reputation and his ability to obtain future employment — without granting him a name-clearing hearing. Like the district court, we believe that in order to state a claim under the Due Process Clause, a plaintiff must allege a likelihood that prospective employers will inspect his personnel file. Accordingly, the district court did not abuse its discretion in dismissing Sciolino's first amended complaint.

## A.

Although Sciolino, as a probationary employee, has no protected "property" interest in his employment with the City, a public employer cannot deprive a probationary employee of his "freedom to take advantage of other employment opportunities." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972). For this reason, a Fourteenth Amendment "liberty interest is implicated by public announcement of reasons for an employee's discharge." *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990).

Sciolino's claim thus arises from the combination of two distinct rights protected by the Fourteenth Amendment: (1) the liberty "'to

engage in any of the common occupations of life,'" *Roth*, 408 U.S. at 572 (*quoting Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)); and (2) the right to due process "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see also Paul v. Davis*, 424 U.S. 693, 701 (1976) (explaining that an individual's liberty interest in his reputation is only sufficient "to invoke the procedural protection of the Due Process Clause" if combined with "some more tangible interest[ ] such as employment").[1]

To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false. *See Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988).

At this stage, the only element seriously at issue[2] is the second, the

---

[1]Relying solely on a letter written by Chief Mook, the City argues that Sciolino received the required "notice and opportunity to be heard" prior to his discharge. In that letter, Mook wrote to Sciolino, "On September 16, 2003, I met with you in accordance with City Policy to provide you the opportunity to respond to the allegation against you . . . ." The referenced meeting may have afforded Sciolino all the process to which he would be due; we simply do not know that at this early stage. Sciolino alleges that the City denied him "procedural rights, including a hearing" and "a forum in which he would have had the opportunity to clear his name." To determine whether the process given Sciolino suffices, a court must assess the three factors enumerated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Applying the *Mathews* test in a similar context in *Boston v. Webb*, 783 F.2d 1163, 1166 (4th Cir. 1986), we upheld a process by which the individual, on two occasions, was given adequate notice, allowed to testify and present witnesses, and was represented by counsel. The record in this case is not sufficiently developed to make this sort of evaluation. Viewing the pleadings in the light most favorable to Sciolino, as we must at this stage, we cannot now hold that the meeting referred to in Mook's letter fulfilled the requirements of the Due Process Clause.

[2]The City also briefly contends that Sciolino's first amended complaint did not allege the first element, i.e., that the charges against Sciolino do

requirement that the charges have been "made public" — or that there has been a "public disclosure." *See Bishop v. Wood* 426 U.S. 341, 348 (1976). Sciolino alleges in his first amended complaint that his file "may be available" to prospective employers. Quoting our decision in *Ledford v. Delancey*, 612 F.2d 883, 886-87 (4th Cir. 1980), he argues that a plaintiff satisfies the dissemination element if he alleges that his personnel file "'*may* be the subject of inspection by prospective employers.'" Brief of Appellant at 9 (emphasis added by Appellant). In contrast, the City contends that a plaintiff must allege a specific incident of "actual publication" of the personnel file to state a claim. Brief of Appellees at 19. The district court selected an intermediate standard, holding that to state a claim the plaintiff must allege a "likelihood of dissemination" of the false charges to prospective employers.[3]

---

not rise to the level of "'imply[ing] the existence of serious character defects such as dishonesty or immorality.'" Brief of Appellees at 8 (*quoting Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982)). We disagree. In *Robertson*, we held that "[a]llegations of incompetence" alone could not give rise to a protected liberty interest. 679 F.2d at 1092. But "we have distinguished statements that imply . . . serious character defects from statements that simply allege 'incompetence.'" *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 308-09 (4th Cir. 2006). We have noted that "charges of . . . Department regulation violations that 'smack of deliberate fraud' and 'in effect allege dishonesty'" clearly meet the *Robertson* standard and give rise to a constitutional claim. *Id.* (*quoting McNeill v. Butz*, 480 F.2d 314, 319-20 (4th Cir. 1973)). The City's charge here that Sciolino falsely advanced the odometer, thus deliberately destroying city property in violation of a Department regulation, implies "the existence of serious character defects such as dishonesty or immorality." *Robertson*, 679 F.2d at 1092. Accordingly, Sciolino's first amended complaint sufficiently alleged this element of the cause of action.

[3]The City's argument that Sciolino cannot possibly meet *any* public disclosure standard because his personnel file is protected from dissemination by a state statute — the Government Data Collection and Dissemination Practices Act, Va. Code Ann. §§ 2.2-3800 to 2.2-3809 (West 2004) — ignores the allegation in Sciolino's complaint that in practice the City discloses these files, and is belied by the City's admission that its own "official Police Department policy . . . authorizes" the police department to respond to an inquiry from a prospective employer by

B.

Although they emphasize different portions of *Bishop* and *Ledford*, each side contends that these cases dictate the standard it espouses. Actually, neither case does so.

In *Bishop*, the Supreme Court considered the case of a discharged city police officer who sued his former employer contending that false charges accompanying his discharge "deprived him of an interest in liberty protected by" the Due Process Clause, even though his employer had not "public[ly] disclose[d] the reasons for the discharge." 426 U.S. at 343, 348. The Court held that the employer's explanation could not "properly form the basis for a claim that petitioner's interest in his good name, reputation, honor, or integrity was thereby impaired" because, since the explanation had not been made public, even if false it would have had "no different impact on his reputation than if [it] had been true." *Id.* at 348-49 (internal quotation marks omitted). *Bishop* thus holds that a *purely private* communication of the reasons for an employee's termination cannot form the basis for a due process claim, because there is no possibility of the allegation affecting the individual's Fourteenth Amendment liberty interests.

We then took up the question, in *Ledford*, of whether "false information contained in [a discharged probationary employee's] personnel file has impaired his ability to procure other employment." 612 F.2d at 885. The district court had granted the public employer summary judgment, reasoning that "[t]he mere fact that an employer may

revealing the employee's "reason for leaving" the department. Brief of Appellees at 18 n.4. Moreover, this city policy allows the police department to reveal additional information "if the employee's history could place the requesting agency in a high liability situation," *id.* — presumably the case with an employee who has deliberately destroyed government property. At oral argument the City again conceded that "under certain circumstances there is some dissemination" by it of an employee's personnel file. Thus, the City admits not only that it is legally authorized to share personnel files with prospective employers, but also that it is its practice to do so in some circumstances.

communicate with prospective employers as to the asserted reasons for nonretention does not . . . rise to the level of an infringement of liberty." Quoted in Brief of Appellant at 16, *Ledford*, 612 F.2d 883 (4th Cir. 1980), 1977 WL 203837. We reversed, holding that a public employee "does have a protected right with respect to the contents of his personnel file when that file may be the subject of inspection by prospective employers." *Ledford*, 612 F.2d at 886. We explained that this standard had been satisfied because "one may fairly infer that the plaintiff has alleged that certain false information has been circulated and will continue to be circulated to prospective employers." *Id.* at 886-87. We did not hold that a plaintiff *must* allege actual dissemination of the information to a particular prospective employer, only that in the case before us "one may fairly infer" that the plaintiff *had alleged* actual dissemination.[4] And we immediately reiterated that a "[p]laintiff has a right that his personnel file contain no substantially false information . . . when that information *is* available to prospective employers." *Id.* at 887 (emphasis added).

Not only do neither *Bishop* nor *Ledford* resolve the question before us, but also the cases from our sister circuits articulate varying standards as to the meaning of public disclosure. Some courts hold that a personnel file containing the stigmatizing statement must *actually* have been disseminated to a potential employer. *See Johnson v. Martin*, 943 F.2d 15, 16-17 (7th Cir. 1991); *cf. Burton v. Town of Littleton*, 426 F.3d 9, 15 n.5 (1st Cir. 2005) (noting that to prove dissemination a "plaintiff must marshal sufficient evidence to support a conclusion that any of the prospective employers requested, or that

---

[4]It is not entirely clear from our opinion in *Ledford*, but the briefs in that case reveal that the plaintiff did, in fact, allege that his file had actually been disseminated to prospective employers. The plaintiff contended "that he was denied positions with at least three other local governmental agencies specifically because" the damaging information in his personnel file was disseminated to them. Brief of Appellant at 16, *Ledford*, 612 F.2d 883 (4th Cir. 1980), 1977 WL 203837. Thus, our *holding* in *Ledford* is only that a plaintiff who has alleged actual dissemination *does* have a constitutional claim. *Ledford* does not reach the question before us — whether less than actual dissemination can provide the basis for a constitutional claim — but the statements in *Ledford* quoted above and *infra* n.5 suggest that something less than actual dissemination does suffice.

the defendants divulged, information regarding the circumstances surrounding [her] termination" (internal quotation marks omitted) (alteration in original)). Others hold that the mere "presence" of information in a personnel file, without more, is insufficient to require due process. *Hughes v. City of Garland*, 204 F.3d 223, 228 (5th Cir. 2000); *Copeland v. Philadelphia Police Dep't*, 840 F.2d 1139, 1148 (3d Cir. 1988). Still others require only that the file "would be available to prospective employers," *Clark v. Mann*, 562 F.2d 1104, 1116 (8th Cir. 1977); that there must be a "possibility" that potential employers will see the information, *Bailey v. Kirk*, 777 F.2d 567, 580 n.18 (10th Cir. 1985) (*citing Burris v. Willis Indep. Sch. Dist.*, 713 F.2d 1087, 1092 (5th Cir. 1983)); or that the "presence of stigmatizing information" in a personnel file was part of the public record and so could be obtained by prospective employers, even though it had not been disseminated to any particular employer, *Buxton v. City of Plant City*, 871 F.2d 1037, 1045-46 (11th Cir. 1989). The Second Circuit requires, as the district court did here, a likelihood that the files would be seen by potential employers. *See Brandt v. Bd. of Coop. Educ. Servs.*, 820 F.2d 41, 44-45 (2d Cir. 1987) ("[T]he public disclosure requirement has been satisfied where the stigmatizing charges are placed in the discharged employee's personnel file and are likely to be disclosed to prospective employers.").

## C.

Although neither *Bishop* nor *Ledford* resolves what a plaintiff must allege to meet the "public disclosure" requirement, the Supreme Court has provided helpful guidance as to what the Due Process Clause requires.

First, of course, the Court instructed in *Bishop* that the Due Process Clause "is not a guarantee against incorrect or ill-advised personnel decisions" and that the Constitution should not "penalize forthright and truthful communication between employer and employee." *Bishop*, 426 U.S. at 350, 349. For this reason, we agree with the district court that a plaintiff must allege more than the "mere presence" of stigmatizing charges that "may be available" to prospective employers. If we were to adopt the "may be available" standard, even if there was just a small chance that any prospective employer could inspect the file, or an uncertainty as to whether the former employer

would ever make the file available, a plaintiff would still have a cause of action. But in those cases, the plaintiff would be unlikely to be deprived of future employment or to have his reputation tarnished. Accordingly, to the extent that there is just a slight possibility that stigmatizing charges in a personnel file could be available to prospective employers, the Constitution does not recognize the deprivation of a liberty interest.

Although we conclude that a plaintiff must allege more than that his file "may be available" to a prospective employer, we also reject the City's contention that a plaintiff must allege a specific instance of actual dissemination. Under the City's proposed standard, even if a plaintiff alleged a likelihood that prospective employers would see the false and stigmatizing charges in his file, he would not have a cause of action. Such an approach would be contrary to the requirements of the Fourteenth Amendment. A public employer who fires (or refuses to rehire) an employee in a manner that sullies the employee's good name and restricts his future employment opportunities deprives him of important liberty interests protected by the Fourteenth Amendment. *See Roth*, 408 U.S. at 573. When a plaintiff alleges that his termination is based on false, stigmatizing charges that are likely to be inspected by prospective employers, he states a claim that the government has deprived him of these liberty interests.

If prospective employers are likely to see the stigmatizing allegations, an employee must choose between finding future employment and protecting his reputation by not applying for jobs (and thus not risking the release of the stigmatizing allegations). Requiring a plaintiff to "wait until he actually loses some job opportunities" would "place him between the devil and the deep blue sea." *Brandt*, 820 F.2d at 45 (internal quotation marks omitted) (adopting the likelihood standard). If a plaintiff must allege a specific instance of actual dissemination to a prospective employer, he would not be "as free as before to seek another job." *Bishop*, 426 U.S. at 348 (*quoting Roth*, 408 U.S. at 575 (internal quotation marks omitted)).

In situations like that at hand, the constitutional harm "is not the defamation" itself; rather it is "the denial of a hearing at which the dismissed employee has an opportunity to refute the public charge." *Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555, 558 (4th Cir. 1976).

If an allegation of actual dissemination were required, the information would have already been communicated to a potential employer, the employee's job opportunities foreclosed, and his reputation damaged *before* any possibility for a name-clearing hearing. Further, a requirement that an employer need only provide a name-clearing hearing if it actually disseminates the employee's personnel file to a specific prospective employer would be virtually impossible to enforce. Most job applicants will never know whether a prospective employer decides against hiring them because of false damaging charges in a personnel file, or for other reasons, and would not even know if the prospective employer has learned of the charges. Therefore, a requirement that a plaintiff must allege actual disclosure to a particular prospective employer would undermine the liberties protected by the Fourteenth Amendment.

For these reasons, we believe the district court selected the appropriate standard. A plaintiff need not allege that his file has actually been disseminated to particular prospective employers. But, he must allege more than that his file "may be available" to them. We thus hold that an employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the file.

A plaintiff can meet this standard in two ways. First, the employee could allege (and ultimately prove) that his former employer has a practice of releasing personnel files to all inquiring employers. Second, the employee could allege that although his former employer releases personnel files only to certain inquiring employers, that he intends to apply to at least one of these employers. In either case, he must allege that the prospective employer is likely to request the file from his former employer.[5] The likelihood standard protects the

---

[5]We note that our statements in *Ledford*, 612 F.2d at 886-87, that the plaintiff had a constitutional claim when his personnel file "may be the subject of inspection" by or "is available" to prospective employers, do not conflict with our holding here. Stating that a file "may be the subject of inspection" by or "is available" to prospective employers implies that employers will have the ability to inspect the file if they so choose; it does not speak to the probability that they will do so. In fact, given that employers typically request information or files of prospective employ-

employee's constitutional liberty interests but does not unduly interfere with the employer's personnel administration. It imposes no "enormous costs," *post* at 26, because an employer need only grant a name-clearing hearing if it *will* make false damaging charges about a former employee available to those likely to request the information, e.g., future employers to whom the employee will apply.[6]

Sciolino's first amended complaint did not meet this standard because it alleged only that his file with the charges "may be available to prospective employers." We thus affirm the district court's order dismissing his complaint.

### III.

Sciolino also appeals the district court's order denying his Rule 15(a) motion to file a second amended complaint — one that he intended to state a claim that would satisfy the likelihood of dissemination standard.

Sciolino's Rule 15(a) motion accompanied a Rule 59(e) motion to alter or amend the judgment of dismissal. The district court applied the appropriate standard in denying the Rule 59(e) motion because Sciolino did not identify an intervening change in controlling law, newly discovered evidence, a clear error of law, or the necessity for prevention of manifest injustice. *See Hutchinson v. Staton*, 994 F.2d 1076, 1081 (4th Cir. 1993). The district court, however, erroneously

---

ees, our language in *Ledford* points to the likelihood of dissemination standard. The likelihood standard requires a plaintiff to allege that the personnel file is available to prospective employers, and that those prospective employers not only have permission to, but are likely to, inspect the file.

[6]Indeed, rather than there being "little that state and local governments will be *able* to do to avoid litigation" under our holding, *post* at 26-27 (emphasis added), there is little they must do: refrain from memorializing false and stigmatizing charges while dismissing an employee; *or*, if they do level such charges, provide a name-clearing opportunity; *or*, if they do not want to provide this opportunity, keep the false stigmatizing allegations private.

applied this same standard — rather than the standard for consideration of Rule 15(a) motions — to Sciolino's motion to amend his complaint.

Under Rule 15(a), after filing a first amended complaint by right, a plaintiff may subsequently amend his complaint only with permission from the court. Still, Rule 15(a) instructs that leave to amend "shall be freely given when justice so requires." As our en banc court has recently explained, "[t]his liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). For this reason, "[w]e have interpreted Rule 15(a) to provide that 'leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile.'" *Id.* (*quoting Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)). And, we have held that "a post-judgment motion to amend is evaluated under the same legal standard as a similar motion filed before judgment was entered — for prejudice, bad faith, or futility." *Id.* at 427.

There is no reason why allowing Sciolino to amend his complaint would prejudice the City, and there is no evidence of bad faith. Nor would amendment be futile. Sciolino's proposed second amended complaint alleges that it is the practice of the Newport News Police Department to disseminate former employees' personnel files to "[l]ocal and regional police departments, specifically including, and by way of example, the police departments of the cities of Suffolk and Hampton." Although the complaint does not explicitly state that Sciolino has applied to these particular employers, reading the complaint "liberally in favor of the plaintiff," *Anderson v. Found. for Advancement, Educ. and Employment of Am. Indians*, 155 F.3d 500, 505 (4th Cir. 1998) (*citing* Fed. R. Civ. P. 8; *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)), as we must, the complaint must be construed to assert that Sciolino intends to apply to these local and regional police departments. To succeed, of course, Sciolino must *prove* that a prospective employer to whom he will apply is likely to inspect the false allegations in his personnel file; but allowing Sciolino to amend his complaint would not be futile. Accordingly, the district court

abused its discretion in denying Sciolino's motion to amend his complaint.[7]

### IV.

We thus chart a middle ground, adopting neither the position favored by Sciolino nor that espoused by the City. We believe that this approach best accords with the limited, but important, liberty interests at issue here and the Fourteenth Amendment's guarantee that the government will not deprive an individual of *any* liberty right "without due process."

Although our approach is a modest one, our distinguished colleague dissents vehemently and at considerable length. But stripped of professorial musings on questions not at issue here and repeated misstatements of our holding,[8] the dissent's disagreement with us

---

[7]A "district court may not grant" a post-judgment motion to amend a complaint "unless the judgment is vacated pursuant to Rule 59(e)." *Laber*, 438 F.3d at 427. Although denial of a Rule 59(e) motion may otherwise be appropriate, when a district court "abuse[s] its discretion in denying a motion to amend," this provides "sufficient grounds on which to reverse the district court's denial of a Rule 59(e) motion." *Id.* at 427-28 (*citing Foman v. Davis*, 371 U.S. 178, 182 (1962)). We therefore vacate the district court's judgment denying Sciolino's Rule 59(e) motion as well.

[8]For example, the dissent philosophizes on the merits of federalism principles and state tort law remedies, with which no one disagrees, and bemoans the asserted burdens that the Supreme Court has held the Constitution imposes on public employers, burdens that no lower court can question. The dissent also repeatedly suggests that we hold that a liberty interest can be "infringed by a letter in a file drawer," *post* at 18; *see also id.* at 15, 19, 20, 22, and 24. Of course, this is not so. What we in fact hold is that in order to state a liberty interest, an individual in Sciolino's position must allege that, in connection with his discharge, his former employer has leveled against him false, stigmatizing charges that are *likely* to be disseminated.

The dissent also incorrectly suggests (apparently to strike down a strawman, *post* at 29) that we posit that it would create an unfair burden if a "former employee might have to seek discovery in order to be certain that he had a cause of action." *See id.* at 27. Actually, we have not so much as mentioned discovery burdens, because we believe constitutional requirements, not "practical problems" and other "matters of policy," are paramount here. *Cf. id.* at 16, 23, 23-27.

devolves to a single contention. The dissent believes that a plaintiff in Sciolino's position has no right to an opportunity to clear his name when a former employer has dismissed him from his job *and* made false, stigmatizing allegations that are likely to be seen by future employers.

Tellingly, in support of its position the dissent can proffer only that the Supreme Court has "refused to find a constitutional interest" in the "consequences that might flow from employees' terminations *or* the records pertaining to them." *Post* at 22 (emphasis added). This contention avails the dissent not at all, for it is both irrelevant and inaccurate. The dissent's contention is irrelevant because Sciolino's claim arises from his termination *and* the "records pertaining to" it. It is inaccurate because when a plaintiff alleges, as Sciolino has, that the "records pertaining to" his termination might seriously damage his standing in the community, the Supreme Court (contrary to the dissent's contention) has in fact been willing "to find a constitutional interest" in the "consequences that might flow from . . . the[se] records." *Post* at 22. Indeed, in *Roth* itself, on which the dissent heavily relies, the Court explained that if, in connection with an adverse employment decision, the state "ma[d]e any charge against [an employee] that might seriously damage his standing and associations in his community," then "due process would accord an opportunity to refute the charge." *Roth*, 408 U.S. at 573.

So it is here. In so holding we are neither "predict[ing] future harms," *post* at 21, nor "reasoning from the remedy . . . back to the creation of a constitutional wrong," *id.* at 27-28. Rather, we are simply recognizing a present harm: the failure to provide a name-clearing hearing when an employee faces a restriction on future employment and the sullying of his good name as prospective employers learn of false, stigmatizing allegations regarding the reasons for his termination. The meaningful opportunity to be heard to which Sciolino is entitled in these circumstances is not a remedy but a right that "due process . . . accord[s]." *Roth*, 408 U.S. at 573.[9]

---

[9]Moreover, contrary to the dissent's suggestion, *post* at 20, 27-28, a plaintiff need not have suffered the full consequences of the deprivation of his liberty to have rights under the Due Process Clause, or standing

To be sure, Sciolino is not entitled to many of the rights afforded some public employees (e.g. those protected by tenure or contract), but when dismissed from public employment even a probationary or at-will employee is entitled to take with him his good name. Long ago the Supreme Court determined that when "the State attaches 'a badge of infamy' to the citizen, due process comes into play." *Constantineau*, 400 U.S. at 437. Fundamental to due process is an opportunity to be heard — "an opportunity which must be granted at a meaningful time." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). An opportunity to clear your name after it has been ruined by dissemination of false, stigmatizing charges is not "meaningful."

V.

For the foregoing reasons we vacate the judgment of the district court, and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

WILKINSON, Circuit Judge, dissenting:

The majority holds that a document in a government file drawer can violate a constitutional liberty interest in reputation and future employment. It holds in particular that the Newport News Police Department may have deprived former probationary employee Christopher Sciolino of "life, liberty, or property" by explaining in a letter to Sciolino himself that Sciolino's employment was being terminated due to alleged misconduct and then placing the letter in its files. So

---

to sue. Thus, for example, revocation of a prisoner's "good time" is a deprivation of liberty that gives rise to due process rights even though it "very likely, does not then and there work any change in the conditions of his liberty." *Wolff v. McDonnell*, 418 U.S. 539, 560-61 (1974). Indeed, "the right to be heard *before* being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 168 (1951) (emphasis added).

mistrustful is the majority of state and local governments that it extends the Fourteenth Amendment to forbid actions that unpredictable courts predict create a "likelihood" of future harm. In this respect, as in others, the majority fails to grapple with the many practical problems of its holding.

My fine colleagues also contend that Newport News has made "charge[s] against [Sciolino] that might seriously damage his standing and associations in his community." Maj. Op. at 14 (quoting *Roth*, 408 U.S. at 573). This implies that the city has gone public in some fashion. *See Bishop v. Wood*, 426 U.S. 341, 348 (1976) (requiring that information concerning discharge be "made public" to infringe constitutional interest). Newport News has done nothing of the sort. It has done nothing but keep its own record, which it must do if it is not to act arbitrarily and if it is to protect itself from future litigation. Thus to say that Newport News has somehow jeopardized the plaintiff's standing in the community is a complete mischaracterization of the city's conduct. There is no contention — much less evidence — that Newport News made the letter public or sent the letter to any future employer. In fact, the majority's "likelihood" standard concedes as much. Newport News has caused the plaintiff no reputational harm. It has acted in a way that would avoid causing the plaintiff reputational harm, so it has not deprived anyone of any Fourteenth Amendment interest.

I would not create a constitutional cause of action out of record-keeping functions. I respectfully dissent from the majority's departure from constitutional text and Supreme Court precedent, a departure that extends judge-made law over routine aspects of the employment relationship in every state and local government in our circuit.

I.

There is at least one thing upon which the majority and I can agree: The circuits are split as to whether stigmatizing allegations can deprive a former government employee of a constitutional liberty interest before the allegations are disseminated to prospective employers or others.

The First and Seventh Circuits have written that such statements can only deprive a former government employee of a liberty interest

when the allegations are publicly disseminated. *See Johnson v. Martin*, 943 F.2d 15, 16-17 (7th Cir. 1991); *Burton v. Town of Littleton*, 426 F.3d 9, 17 (1st Cir. 2005); *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 103 (1st Cir. 2002). The Third Circuit has suggested the same, in my view, by stating that a plaintiff "must produce evidence that the reason for his termination was made public by the city" and rejecting a plaintiff's argument that he had been deprived of liberty because future disclosure was likely. *Copeland v. Philadelphia Police Dep't*, 840 F.2d 1139, 1148 (3d Cir. 1988).

The Second and Tenth Circuits have written, in contrast, that stigmatizing allegations can deprive a person of a liberty interest even if the allegations have not been publicly disclosed. The Second Circuit held in *Brandt v. Board of Cooperative Educational Services* that a liberty interest is implicated "where the stigmatizing charges are placed in the discharged employee's personnel file and are *likely* to be disclosed to prospective employers." 820 F.2d 41, 45 (2d Cir. 1987) (emphasis added). The Tenth Circuit also recognized a claim based upon statements that the plaintiff did not allege went beyond a government employer's own offices. *Bailey v. Kirk*, 777 F.2d 567, 580 n.18 (10th Cir. 1985).

Other circuits do not fit neatly into these two camps. The Eighth Circuit has suggested that a claim would lie if a plaintiff established that a record "*would* be available to prospective employers," *Clark v. Mann*, 562 F.2d 1104, 1116 (8th Cir. 1977) (emphasis added), but suggested in another case that information must be disclosed before it could give rise to a cause of action, *Merritt v. Reed*, 120 F.3d 124, 126 (8th Cir. 1997).

The Fifth Circuit's cases also seem to be in some internal tension. The court appears to have sanctioned claims based upon the possibility that allegations would be disclosed in the future, writing that an ex-employee could establish deprivation of a liberty interest by showing "that his employer has made *or is likely to make* the allegedly stigmatizing charges public in any official or intentional manner." *In re Selcraig*, 705 F.2d 789, 796 n.6 (5th Cir. 1983) (emphasis added; internal quotations omitted). Yet a subsequent court rejected a plaintiff's likelihood-of-dissemination theory, equating it with an argument that "the mere presence" of stigmatizing allegations in a personnel file

was sufficient to create a triable issue of fact. *Hughes v. City of Garland*, 204 F.3d 223, 228 (5th Cir. 2000).

Finally, other circuits have recognized liberty claims when authorities lacked the power to keep statements confidential because personnel files were publicly available under state law, but have not addressed whether predictions of dissemination would suffice in the absence of such statutes. *See Cox v. Roskelley*, 359 F.3d 1105, 1110-12 (9th Cir. 2004); *Buxton v. City of Plant City*, 871 F.2d 1037, 1042-46 (11th Cir. 1989).

Thus to say there is a circuit split is at once true and not indicative of the full extent of the problem. Whether a liberty interest is infringed by a letter in a file drawer has generated answers with shades and permutations that mock the clarity law must provide for human conduct.

## II.

## A.

While both the majority and I recognize the circuits' division, we diverge after that. Our disagreements run first to the treatment of constitutional text and structure. The majority appears to regard the conflicting circuit court rulings as a menu from which to select the standard of liability that it believes would amount to the best policy. It concludes that a terminated public employee may raise a Fourteenth Amendment claim based upon stigmatizing information in government personnel files even if the charges have never been made public,[1] so long as the plaintiff alleges "a likelihood that prospective employers . . . or the public at large will inspect the file" at some point in the future. Maj. Op. at 10. I reject this conclusion because far from authorizing the creation of such an interest, constitutional text and Supreme Court precedent foreclose both the holding in this case and the approach used to reach it.

---

[1]The plaintiff may have made the allegations against him publicly available by filing his lawsuit, but the Supreme Court has held that self-generated exposure in litigation does not give rise to a constitutional claim. *Bishop v. Wood*, 426 U.S. 341, 348-49 (1976).

While the rights of public employees may be protected in many different ways, the text of the Fourteenth Amendment does not permit the recognition of a liberty interest in not having stigmatizing information on file. By declaring that no state shall "deprive any person of life, liberty, or property, without due process of law," the amendment permits judicial oversight of government procedures relating only to actions that "deprive" persons of interests within the named categories of "life, liberty, or property" — categories that are "not infinite." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972).

The Fourteenth Amendment did reorder the relationship of the federal and state governments in fundamental respects, but it did not displace state law as a residual protector of many interests the Fourteenth Amendment did not enumerate. Holdings that would "mandat[e] judicial oversight of communications between and among government employees and their superiors in the course of official business" can lead to "permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and separation of powers." *Garcetti v. Ceballos*, ___ U.S. ___, 126 S. Ct. 1951, 1961 (2006). In light of the amendment's text and the federal structure, the Supreme Court has held that loss of reputation, government employment, and diminished professional prospects rise to the level of Fourteenth Amendment deprivations only under limited conditions that the majority disregards.

To begin with, it is undisputed that as a probationary employee the plaintiff has no Fourteenth Amendment property interest in a government job itself. As a result, all agree, he had neither a right to a hearing before the termination of his employment nor a right to know the reasons for his dismissal. *Bishop*, 426 U.S. at 348. The loss of a government job and a filed record detailing the reasons for that loss are obviously no small matter. But the Constitution cannot possibly remedy every wrong experienced in life or for that matter every wrong experienced at the hand of some public entity. So the question must be where constitutional law properly leaves off and where statutory and common law remedies kick in. The question must be asked: the Fourteenth Amendment cannot be read to displace state remedial mechanisms by rendering the Constitution "a font of tort law to be

superimposed upon whatever systems may already be administered by the States." *Paul v. Davis*, 424 U.S. 693, 701 (1976).

While it is constitutionally safeguarded in some instances, "reputation" is neither listed nor enumerated in the Fourteenth Amendment as a protected interest or right. There is no basis to elevate reputational harm above others into a constitutional interest because "[t]he words 'liberty' and 'property' as used in the Fourteenth Amendment do not in terms single out reputation as a candidate for special protection over and above other interests that may be protected by state law." *Id.* A claim based upon stigmatizing government statements can therefore arise neither alone nor in the abstract. Rather, because reputation is indistinguishable from a multitude of personal, dignitary, and proprietary interests that state courts and legislatures may deem worthy of protection, the cases establish that neither the harms from the loss of at-will employment nor the harms from stigmatizing information rise by themselves to the level of constitutional harm. *Id.*; *Roth*, 408 U.S. at 575. It is only when termination is combined with stigmatizing disclosures that the resulting harm is of constitutional magnitude.[2]

The majority's conception of Fourteenth Amendment deprivation is as flawed as its discussion of Fourteenth Amendment interests. The plaintiff has not yet been deprived of an interest in his reputation, because the reasons for his dismissal evidently remain in a government file. Moreover, the liberty "to engage in any of the common occupations of life" posited in *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), has not been infringed where the employer has neither made any information public nor shared information with a future employer. In short, the plaintiff has suffered no deprivation of reputation or of his ability to pursue other jobs.

---

[2]The majority contends that a failure to adopt its likelihood standard would strip the Due Process Clause of its historic function in providing pre-deprivation hearings. Maj. Op. 14-15 n.9. A pre-deprivation hearing, however, is mandated only when a public entity is proposing to deprive an individual of a constitutionally protected right or interest, and, even in such circumstances, a pre-deprivation hearing may not always be required. *See, e.g., Parratt v. Taylor*, 451 U.S. 527, 540-41 (1981). Here, the City of Newport News is not proposing such an action, and it is improper to subject a public entity to suit purely on the basis of a record-keeping function.

The majority nevertheless holds that the Constitution can be violated if it finds "a likelihood" of future disclosure and reputational harm. Maj. Op. at 10. The Constitution does not give courts the power to predict future harms and declare the Constitution violated before the possible harms transpire. The text makes it actionable for states to "deprive" a person of "life, liberty, or property," but not to create a "likelihood" of such a deprivation. Whether the majority addresses Fourteenth Amendment "interests" or "deprivations," it has done violence to our constitutional text and reordered our constitutional structure. The upshot is to federalize myriad aspects of the local employment relationship without any pretense of democratic sanction.

B.

If there was room for doubt about this matter, the Supreme Court eliminated it in *Bishop v. Wood*, 426 U.S. 341 (1976). *Bishop* directly took up the question of when allegations of employee misconduct in connection with a termination implicate a Fourteenth Amendment interest. The plaintiff alleged that a police department deprived him of liberty when it terminated his employment and provided him with false and stigmatizing reasons for his discharge that might "severely damage his reputation in the community." *Id.* at 347. The Supreme Court found that in the absence of disclosure, the employer had caused no constitutional harm. Since the explanation of the plaintiff's discharge "was not *made public*" before the plaintiff disclosed the allegations through his own lawsuit, the Court wrote that the explanation "cannot properly form the basis for a claim that petitioner's interest in his 'good name, reputation, honor, or integrity' was thereby impaired." *Id.* at 348 (emphasis added; footnote omitted). The Fourteenth Amendment was not implicated, the Court concluded, by "the discharge of a public employee whose position is terminable at the will of the employer *when there is no public disclosure of the reasons for the discharge*." *Id.* (emphasis added). To like effect is *Codd v. Velger*, which summarized the cases on constitutionally mandated hearings by noting, "Only if the employer *creates and disseminates* a false and defamatory impression about the employee in connection with his termination is such a hearing required." 429 U.S. 624, 628 (1977) (emphasis added).

The majority acknowledges the binding precedent on this matter, as it must, but seems inexplicably puzzled by the Supreme Court's

plain language. The Supreme Court has used the words "made public" and "public disclosure" to describe the threshold of constitutional harm, but the majority writes that *Bishop* did not "resolve the question" of what a plaintiff must allege to meet this requirement. Maj. Op. at 7; *see also* Maj. Op. at 8. This observation wishes for ambiguity where there is none. To "make public" means "to cause to become known generally" just as "disclosure" entails "exposure" or "revelation," and the majority cites no alternative definition or use that calls into doubt the meanings familiar to schoolchildren. *The Random House Dictionary of the English Language* 562, 1562-63 (2d ed. 1987). As the Seventh Circuit has written, adopting a "likelihood of disclosure" standard for liability based upon stigmatizing personnel records requires "[d]efining 'public disclosure' in a way which encompasses 'no public disclosure'" — "an exercise we choose not to embrace." *Martin*, 943 F.2d at 17.

Perhaps in recognition of these problems, the majority casts about for other possible injuries on which it can hang judicial intervention, seizing upon a potential indirect consequence of virtually any employee's termination. It writes that a former employee might fear that prospective employers would make inquiries about his past job performance and might limit his job search as a result. *See* Maj. Op. at 9. Although these possible chilling effects are the only harm that a plaintiff could be said to have suffered from a letter in a file, my colleagues would evidently not require a plaintiff to plead or prove that he suffered even this indirect injury.

Moreover, this attenuated consequence cannot rise to the level of a constitutional deprivation, because injuries that are more serious and direct do not warrant constitutionalization. *Roth*, *Bishop*, and *Paul* did not reject Fourteenth Amendment claims because of blindness to the negative professional or reputational consequences that might flow from employees' terminations or the records pertaining to them — the cases explicitly recognized such consequences. *See Roth*, 408 U.S. at 574 n.13; *Paul*, 424 U.S. at 701. They nevertheless refused to find a constitutional interest because the text and structure of the Fourteenth Amendment set too high a bar.

III.

A.

Even if judges were somehow set free to prescribe policy unconstrained by text or precedent, a lively debate might ensue over whether the majority view is suitably wise. My friends make a case that it is, but as with most matters of policy, there exist two sides.

First, slighting the principle that "[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies," *Bishop*, 426 U.S. at 349 (footnote omitted), widens the gap between public and private employees. The majority observes that a former government employee who feared the release of stigmatizing allegations might feel obligated to "choose between finding future employment and protecting his reputation by not applying for jobs." Maj. Op. at 9.

That is all well and good, but these are the precise harms that every person terminated from employment may experience. While the prohibitions on state action in the Fourteenth Amendment will always necessitate some differences in treatment between public and private employees, the majority's standard as to likelihood of harms drives a wedge between these two groups of workers to an extent that many lawmakers might find both divisive and unpalatable. Whether widening the gap in our country between private and public employees is desirable is at least an arguable point, as is whether the majority's approach leaves two groups with very different remedies for comparable harms without compelling reason.

Second, the broad power that the majority claims over personnel matters invades an area in which state and local officials are often better equipped than judges to make decisions. Whether benefits of accuracy and fairness justify the costs of particular procedural safeguards is not a question that can be answered in the abstract and for all time. Leaving the analysis to democratically responsive local authorities where the Constitution's text does not permit judicial involvement makes it possible to strike balances suited to local needs and facilitates adaptation to changing circumstances and new insights.

For example, in permitting liability based upon a letter in a person-
nel file, the majority may make government processes less fair and
more arbitrary by "penaliz[ing] forthright and truthful communication
between employer and employee." *Bishop*, 426 U.S. at 349. The
majority makes it costlier to institute systems of progressive disci-
pline that require documentation of misdeeds and take into account
past conduct in imposing penalties, even though such systems may
benefit both employers and employees. Furthermore, if a government
employee is terminated, he may ask for a reason and his employer
may consider it to be in the interests of fairness to provide an explana-
tion even when there is no legal obligation to do so. But when courts
open governments to liability because they provide such reasons, gov-
ernment employers may simply stop giving them: "where there was
no constitutional requirement for the state to do anything," Judge
Friendly has written, "the state would merely opt to give no reasons
and the employee would lose the benefit of knowing what might
profit him in the future." *Russell v. Hodges*, 470 F.2d 212, 217 (2d
Cir. 1972). Tenured employees, of course, are entitled not simply to
know the reasons for their dismissal but to challenge them through
hearings, *see, e.g.*, *Roth*, 408 U.S. at 576-77, and it seems anomalous
to require the provision of reasons to tenured employees while dis-
couraging the provision of reasons to untenured ones.

Even with respect to untenured employees, some acts of documen-
tation may not be wholly voluntary, and as a result, the majority's
new threat of liability may place governments between a rock and a
hard place. Procedural and substantive limits on employee discipline
are common subjects of collective bargaining, and union agreements
may therefore require documentation of the reasons for dismissals.
*See* Ann C. Hodges, *The Interplay of Civil Service Law and Collec-
tive Bargaining Law in Public Sector Employee Discipline Cases*, 32
B.C. L. Rev. 95, 104-07 (1990). Governments may also record these
reasons in order to defend themselves in the event that a former
employee claims a dismissal was based upon race, sex, or some other
impermissible consideration. Under Title VII of the Civil Rights Act
of 1964, for example, once an employee presents a prima facie case
of unlawful discrimination — a showing that is "not onerous" to make
— the defendant "must clearly set forth, through the introduction of
admissible evidence" the "legitimate, nondiscriminatory reason" for
its challenged action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 253, 255, 254 (1981). This leaves governments with little choice but to document the reasons for major personnel actions, and it is odd, to say the least, to make such records necessary and in the next breath open governments up to liability on the basis of the same documents.

### B.

The practical problems with the majority's approach do not end there. It is no answer to say state and local governments need only avoid constitutional infractions to avoid being found in violation of the Fourteenth Amendment because under the majority's vague standard, this is more easily said than done. The majority imposes an amorphous overlay upon an area of the law where balancing tests already leave state and local governments uncertain about the nature of their obligations. Government employers already face a difficult predictive calculus in establishing procedures to govern actions that indisputably deprive citizens of liberty or property, since the procedures required depend upon judicial balancing of

> [f]irst, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The standard of liability is vague in a second important respect. Employers face additional uncertainty over whether countless personnel documents generated in the course of government operations "imply the existence of serious character defects," and could therefore implicate a constitutional interest if disclosed. *Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982). Adverse personnel actions are by definition taken on the basis of unfavorable assessments, and the majority provides little guidance for gauging which of these assessments are sufficiently unflattering to qualify as actionable.

And the majority now adds a third level of uncertainty: Government employers will have to predict whether a court would find a "likelihood" that even confidential documents would be disclosed in the future. This vague standard imposes enormous costs even when government conduct is found to be blameless, because uncertainty over its application will give rise to litigation in the absence of harm.

This case perfectly illustrates the degree to which the majority's standard will put governments at the mercy of litigants no matter how careful the governments' conduct. Newport News must have imagined it would not be drawn into court under a likelihood-of-dissemination standard: The city concluded that disclosure of the plaintiff's personnel files would be not merely against its own policies but prohibited by law under all but specified circumstances. Under Virginia's Government Data Collection and Dissemination Practices Act, a government agency may "disseminate only that personal information . . . necessary to accomplish a proper purpose of the agency." Va. Code Ann. § 2.2-3803(1). City policy accordingly forbids disclosure of the reasons for an employee's termination except when failure to disclose the reasons to a requesting government agency could place the requestor in a high liability situation. Indeed, the district court agreed that state law would prohibit disclosure of Sciolino's personnel files. Yet neither of these facts saves the city from litigation — and perhaps liability — under the majority's "likelihood" view. *See* Maj. Op. at 5-6 n.3. It is hard to see how almost any statement will not be fodder for litigation under this approach.

Nor can a city avert litigation by offering generous procedural rights because as this case shows, a plaintiff can still enmesh the government in litigation by alleging that yet more safeguards are required. In this case, before Police Chief Mook dismissed Sciolino from his probationary position and wrote him a letter documenting findings of misconduct, Mook met with Sciolino to explain the charges and offer the opportunity to respond. Although the majority concedes that the meeting "may have afforded Sciolino all the process to which he would be due," it keeps the city in court in order to keep its own options open, writing that "[t]he record in this case is not sufficiently developed" to assess the adequacy of the procedural safeguards "at this early stage." *See* Maj. Op. at 4 n.1. As this case illustrates, there is little that state and local governments will be able

to do to avoid litigation over even meritless claims under the unascertainable standards the majority imposes.

Finally, it bears repetition that this whole area reflects a tension between two competing and legitimate interests. On the one hand, there is the interest of the employee in avoiding any negative consequences from stigmatizing accounts of his job performance. On the other, there is the employer's interest in documenting serious employee misconduct and in holding open the prospect of honest and accurate communications between employers about prospective hires who have serious character defects or have even engaged in criminal misdeeds. Where there has been a deprivation of a constitutional interest, *Matthews* requires that courts strike the balance between these considerations. Where, as here, there has been no loss of reputation and indeed no deprivation of any interest rising to constitutional magnitude, legislatures and state governments remain free to balance the employee's interests against the need for maintaining records that will facilitate accurate decision-making. Where the most the public employer has done is put a letter in a file, the balancing of the interests falls to legislatures and not to the courts.

## C.

My colleagues evidently impose this vague and burdensome standard for constitutional liability because they are troubled that if municipal liability could arise only if allegations were disseminated, courts would be restricted in their ability to rework government procedures until after reputational harm occurred. The majority finds this limitation too great to countenance: "If an allegation of actual dissemination were required, the information would have already been communicated to a potential employer, the employee's job opportunities foreclosed, and his reputation damaged *before* any possibility for a [judicially ordered] name-clearing hearing." Maj. Op. at 10. In addition, a former employee might have to seek discovery in order to be certain that he had a cause of action, because he might not know before filing suit whether personnel information had been communicated to members of the public. Maj. Op. at 10.

This reasoning is flawed in several ways. It utilizes a dangerous and forbidden mode of judicial interpretation, reasoning from the

remedy that judges wish to provide back to the creation of a constitutional wrong. This transforms the Due Process Clause from a protection of a named set of rights into a roving commission to rework state and local governments in the manner that judges deem optimal by finding "rights" when necessary. The Supreme Court has confronted and rejected this judicial approach, writing repeatedly that under the Due Process Clause, "The categories of substance and procedure are distinct." *See Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 541 (1985). The first step in a due process inquiry must be to determine "whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment," with courts proceeding to assess the adequacy of process only if so. *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972); *see also Loudermill*, 470 U.S. at 541. *Roth* unambiguously rejected a remedy-first approach, finding that a district court erred when it engaged in such reasoning. *See* 408 U.S. at 569-71.

Moreover, the limitation on judicial power that the majority finds so troubling is a premise of our constitutional system that has served us well for centuries. The majority writes as though it would be remarkable and regrettable that the plaintiff would have to wait until he suffered reputational harm before claiming that his constitutional rights had been violated, but under the conception of the judicial role embedded in our Constitution, a case must involve actual or imminent injury to even be justiciable. *Compare* Maj. Op. at 9 ("Requiring a plaintiff to wait until he actually loses some job opportunities would place him between the devil and the deep blue sea") (internal quotations omitted) *with*, *e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) ("The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as a result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.") (internal quotations omitted). I am not certain that even the requirements of standing are satisfied in this case: A plaintiff may have a cause of action based upon a "likelihood" of future disclosure under the majority's theory, even if the plaintiff is not in immediate danger of reputational harm or other constitutionally cognizable injury.[3] Proceedings

---

[3]The plaintiff's dismissal itself cannot be the source of his claimed injury because it is undisputed that an untenured probationary employee has no constitutional interest in his government job. *See supra* at 19.

in the absence of injury exceed our judicial authority and add unnecessary litigation costs to state and local government budgets.

Nor is it at all remarkable or unique that a potential plaintiff may not have all facts surrounding a possible violation of his constitutional rights before filing suit. While the majority evidently finds unacceptable the Supreme Court's requirement that statements be "made public" in order to give rise to liability because it believes that this requirement makes due process protections "virtually impossible to enforce," *see* Maj. Op. at 10, plaintiffs often do not have all the knowledge necessary to prove their causes of action before filing suit. If they did, there would be no need for the many provisions in the Federal Rules governing the conduct of discovery. *See*, *e.g.*, Fed. R. Civ. P. 11(b)(3), 26-37. The majority's standard would not obviate the need for this discovery. To the contrary, plaintiffs will be required to undertake more extensive discovery and seek the testimony of a greater array of officials now that their cases turn not upon the simple question of whether files have been released but upon the speculative question of whether there exists a likelihood that they would be at some time in the future.

The majority need not fear that state and local governments will run riot in the absence of its novel constitutional doctrine. The elected branches have compelling reasons to safeguard citizens' reputational interests absent the strong medicine of judicial oversight of their internal workings. They are accountable to constituents and often answerable to public employee unions; indeed, they have been providing mechanisms to vindicate reputational interests through causes of action such as defamation since long before the Constitution was invoked for this purpose. Many governments have added to these protections through civil service systems, which "typically restrict the public employer's discretion to discharge and to impose other serious discipline, such as demotion and suspension," and often allow dismissed employees to challenge the reasons for a dismissal through an appeals process. *Hodges*, *supra*, at 103.

Indeed, a government's own effective functioning is served by procedures to ensure that employee morale remains high and that good employees are not lost due to dismissal based upon inaccurate reports. An "actual dissemination" standard for constitutional liability itself

creates incentives to institute procedural protections before the fact. Even when government actors have not made personnel reports public, agencies that wish to reserve the right to disseminate in the future would be well advised to hold hearings when all parties relevant to allegations of misconduct are available and their memories are fresh. Under an actual dissemination standard, however, the judgment about future likelihood would be reserved to the actor most capable of making it — the entity that might disseminate the allegedly stigmatizing statements — and courts would not be drawn into wholly hypothetical disputes about the precise level of name-clearing process required in light of the injurious effects of disclosures that may never occur.[4]

IV.

The Due Process Clause preserves essential freedoms, but it may also tempt judges to overrun their role in order to impose their own conceptions of justice on state and local governments. There is room for constitutional standards in this area, as the Supreme Court has made clear. But placing states and localities at constitutional risk for performing record-keeping functions goes much too far. By over-constitutionalizing public employee relationships, as the majority does here, courts diminish the role of all the other participants in this field and assume that neither employers, nor employees and their representatives, nor state law rights and remedies can fairly be trusted to reach just resolutions. The Supreme Court has sought to avoid the danger of over-constitutionalizing in its own procedural due process cases. When *Roth* rejected a professor's claim that he should be pro-

---

[4]Even under the majority's likelihood-of-dissemination standard, I would affirm the disposition below. Once judgment had issued, the district court did not abuse its discretion in denying the plaintiff's motions under Rule 59(e) and Rule 15(a) to reopen his case and to amend his complaint for a second time. While amendment is permitted when, prior to discovery, a plaintiff "merely adds an additional theory of recovery to the facts already pled," *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (en banc), or when we overrule a precedent that governed the plaintiff's claim at the time of filing, *id.* at 428, neither circumstance is present here. The district court therefore did not abuse its discretion by giving weight to the interests of finality shared by the defendants and the judicial system itself.

vided a hearing to contest his termination, the Supreme Court explained,

> Our analysis of the respondent's constitutional rights in this case in no way indicates a view that an opportunity for a hearing or a statement of reasons for nonretention would, or would not, be appropriate or wise in public colleges and universities. For it is a written Constitution that we apply. Our role is confined to interpretation of that Constitution.

408 U.S. at 578-79 (footnoted omitted).

The majority fails to heed those words. It creates a nebulous new right whose contours assure nothing but the presence of continued litigation and the permanence of judicial oversight. Such are the costs of neglect of text and structure. Whether the majority's views are wise I am content to leave to others, but for reasons stated, I would affirm the district court.