**Edward C. JACKSON, Plaintiff**

v.

**Kevin P. CLARK, et al., Defendants.**

**Civil No. AMD 07–1324.**

United States District Court,
D. Maryland.

July 10, 2008.

---

Timothy Monroe Dixon, Janey and Dixon PC, Catonsville, MD, for Plaintiff.

Karen Stakem Hornig, Michael Francis Conti, Baltimore Police Department, Baltimore, MD, for Defendants.

## MEMORANDUM OPINION
## and ORDER

ANDRE M. DAVIS, District Judge.

Plaintiff Edward C. Jackson, a former Colonel in the Baltimore City Police Department, seeks damages against defendants Kevin P. Clark, the former Police Commissioner, and Kenneth L. Blackwell, the former Deputy Police Commissioner, in a second amended complaint. Defendants removed the action from state court, and have now filed a third motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth within, the motion shall be granted in part and denied in part.

## I.

Plaintiff alleges the following rather sordid tale, which is accepted as true for present purposes. Essentially, he asserts that he was maliciously "set up" to "take the fall" for higher-ups in the police department, in connection with what might have been a criminal violation of police department operating procedures.

Sometime in mid–2003, then Commissioner Clark directed his then deputy Blackwell to inform Ragina Averella, who was a sworn officer assigned as the Director of Public Affairs of the Baltimore Police Department ("BPD"), that she was "no longer needed." (Second Amended Complaint at ¶ 8.) Upon learning that Averella had found employment with the Maryland State Police ("MSP"), Blackwell, with Clark's approval, told Averella that she would continue to be paid as an employee of the BPD while on the MSP payroll to make it easier for her to return to the BPD. (*Id.*) Plaintiff had no knowledge of these events throughout the summer of 2003.

On or about September 13, 2003, Clark assigned Plaintiff, who had been the chief (at the rank of Colonel) of community affairs, to the position of Chief of the Administrative Bureau, a unit responsible for human resource matters, among others. (*Id.* at ¶¶ 9–10.) Meanwhile, unbeknownst to Plaintiff, on or about October 16, 2003, Clark and Blackwell undertook to rehire Averella, apparently at a position other than Director of Public Affairs. (*Id.* at ¶ 11.)

In the course of processing Averella's paperwork and recertification as a police officer with the BPD, Plaintiff's subordinates in human resources discovered that, in fact, Averella had never been terminated from the BPD while she worked at the MSP, apparently a gross deviation from applicable standards. (*Id.*) When he was informed of these circumstances by his subordinates, Plaintiff informed Clark and Blackwell of irregularities surrounding Averella's ostensible departure and her imminent return. (*Id.* at ¶ 12.) Defendants

then ordered Plaintiff to investigate the matter fully. (*Id.*)

Four days later, in response to Clark's request for an "update" on the investigation, Plaintiff told Clark that the investigation had uncovered documents showing that *Clark* and *Blackwell* were responsible for reinstating Averella to the BPD and that, moreover, they were both aware that Averella was receiving her salary from the BPD during the time she was employed with the MSP. (*Id.* at ¶ 13.) In response to Plaintiff's report, Clark and Blackwell ordered Plaintiff to "get more information" and "clean the mess up." (*Id.*) (Clark's predecessor as Police Commissioner had recently been indicted by a federal grand jury during these events for fiscal improprieties, and significant scrutiny of the BPD's fiscal and operational activities by official, community and media constituencies was ongoing.)

On January 5, 2004, Clark requested a further update from Plaintiff. (*Id.* at ¶ 14.) Plaintiff responded by disclosing further information to Clark and Blackwell, and in particular that they had signed every order authorizing Averella's reinstatement to the BPD and that there was no proper "separation paper" from the BPD in Averella's personnel file. (*Id.*) Plaintiff also reported that his investigation uncovered evidence that Clark and Blackwell had approved the continuation of Averella's pay from the BPD even after Averella's departure from the BPD. (*Id.*) Clark then ordered Plaintiff to inform Averella that she was to be terminated. (*Id.*) When Plaintiff so informed Averella, Averella advised Plaintiff to tell Clark and Blackwell that if she were terminated, she would file a lawsuit. (*Id.*)

Upon hearing that Averella was planning a lawsuit, Clark told Plaintiff to ignore his previous order to terminate Averella; that is, Clark indicated to Plaintiff that he, Clark, would handle the matter himself. (*Id.*) Soon thereafter, Clark ordered the Internal Affairs Division ("IAD") of the BPD to conduct an investigation of Averella, Plaintiff, and one of Plaintiff's subordinates, for alleged "criminal and administrative improprieties." (*Id.* at ¶ 15.)

On January 6, 2004, Plaintiff was ordered to release Averella's personnel file to IAD. On January 7, 2004, IAD served Averella and Plaintiff with a formal "Notification of Accused," which summarized the complaint against them that had been filed by Commissioner Clark. (*Id.*) Within days of the Plaintiff being served with disciplinary papers, Clark "authorized the dissemination of facts concerning the disciplinary allegations lodged against the Plaintiff to the local media and members of the community." (*Id.*)

Two articles in the Baltimore *Sun* on January 9, 2004, and January 28, 2004, respectively, reported that Plaintiff "improperly supervised and reinstated the department's former director of public affairs as a police officer." (*Id.*) Plaintiff was "deeply embarrassed and humiliated by the bogus and manufactured IAD investigation and its intentional dissemination to the media." (*Id.*)

On or about January 22, 2004, IAD "interrogated" Plaintiff for four hours regarding Averella's employment with the BPD. (*Id.* at ¶ 16.) Although Plaintiff's high rank in the BPD did not entitle him to the due process protections of the Law Enforcement Officer Bill of Rights ("LEOBR") applicable to lower-ranking officers, Clark had promised Plaintiff that Plaintiff would be afforded those protections, nonetheless, in connection with the IAD proceedings in respect to the Averella matter. (*Id.*) Thus, Plaintiff signed an LEOBR advisement of rights form during the IAD investigation. (*Id.*) Plaintiff ap-

parently cooperated fully in the investigation and, in particular, he provided IAD with documentary evidence showing his "non-involvement" in the Averella personnel issue. (*Id.*)

Plaintiff then waited more than five weeks for the IAD to complete its investigation and to issue its findings and conclusions. (*Id.* at ¶ 17.) On April 1, 2004, Clark called Plaintiff into his office for a meeting. (*Id.*) Clark informed Plaintiff that IAD had sustained the departmental charges that were filed against him (by Clark) and that Plaintiff was being demoted two ranks, from Colonel to Major. (*Id.*) Contemporaneously, Clark denied Plaintiff's request for a due process hearing, i.e., a trial board, and Clark also refused to disclose the IAD findings to Plaintiff. (*Id.*) Clark informed Plaintiff that his employment would be terminated if he contested the demotion. (*Id.*)

Plaintiff alleges that "[w]ithin minutes of Plaintiff's demotion, Defendants had authorized public dissemination of the Plaintiff's demotion to the local news media." (*Id.* at ¶ 18.) Clark announced to the media that Plaintiff had been demoted for misconduct. (*Id.*) In addition, Clark told Plaintiff that if he made any statements to the media, he would be terminated. (*Id.*) Plaintiff left the office without speaking to any media representatives. (*Id.*)

Thereafter, Plaintiff was greatly embarrassed and humiliated when local news outlets reported his demotion. (*Id.*) For instance, Plaintiff recollects that one television news report stated the following: "A popular commander, Chief Edward Jackson, nearly lost his job in a complicated investigation involving his handling of the Regina Averella personnel matter.... Chief Jackson was demoted for improprieties involving former Director of Public Affairs Regina Averella's resignation and

rehire into the Baltimore Police Department." (*Id.*)

Plaintiff was formally notified that his demotion to Major was effective as of April 2, 2004. (*Id.* at ¶ 19.) On April 5, 2004, Clark and Blackwell distributed a personnel order notifying BPD members of his demotion. (*Id.*) This personnel order was "made a permanent part of the Plaintiff's personnel file." (*Id.*) Clark then cancelled Plaintiff's previously approved days off. (*Id.*) In addition, he told Plaintiff that he "did not care about" his mental health, that he was to report immediately to his new post, and that if Plaintiff attempted to use his unlimited medical leave, the BPD would terminate Plaintiff's employment. (*Id.*)

Plaintiff concluded that Clark had made his continued employment with the BPD impossible, believing that Clark had "deliberately gone out his way to destroy [his] career, good name, and reputation." Accordingly, Plaintiff retired from the BPD after twenty-one years. Even after Plaintiff's retirement from the BPD, Clark "made attempts to further punish, harass, degrade, and embarrass [him]." (*Id.* at ¶ 19.) For example, Clark prevented Plaintiff from receiving payment for his unused compensation and vacation, typically granted to command staff members of the BPD who retired after many years of service with the BPD. (*Id.*) Also, Clark was involved in halting Plaintiff's medical benefits for a period of time after his retirement from the BPD. (*Id.*)

In consequence of the events alleged, Plaintiff is unable to attain a command level position with local and state law enforcement agencies because of the negative reference to his demotion contained in his personnel and disciplinary file with the BPD and because of Defendants' public dissemination of the IAD investigation and

subsequent demotion.[1] (*Id.*) Plaintiff charges that as a "direct and proximate result of Defendants' intentional conduct, [he] has suffered and continues to suffer severe emotional distress as well as economic distress and damages." (*Id.*)

## II.

### A.

In *Bell Atlantic Corp. v. Twombly,* —— U.S. ——, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court jettisoned its longstanding approach to motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), i.e., the "no set of facts" standard first articulated by the Court in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), and adopted a less generous approach by which to judge a complaint's sufficiency: whether the plaintiff stated "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. The Court noted that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964–65 (internal quotations omitted). As one colleague has recently stated: "To put it another way, a court should not be required to use a divining rod to ascertain the necessary facts to state a cause of action." *Qwest Communications Corp. v. Maryland–National Capital Park & Planning Commission,* 553 F.Supp.2d 572, 574 (D.Md.2008)(Titus, J.).

### B.

Before proceeding to consider the merits of the parties' arguments, I find several comments in order on several preliminary matters.

First, although Defendants purport to seek dismissal of "all claims," in none of their three motions to dismiss have they briefed or argued why Plaintiff's claims for false light invasion of privacy or interference with economic relations should be dismissed. It appears that Defendants' view the gravamen of Plaintiff's claims to be the *termination of his employment,* i.e., the ostensible wrongful discharge claim, and that if that claim and the sole constitutional claim are dismissed, the entire case falls. I disagree.

In fact, it appears that the gist of Plaintiff's claims is the dignitary harm (and related economic injury) he allegedly suffered arising out of what he says were blatantly false accusations of official misconduct and incompetence. Presumably, this explains why: (1) the case was filed in state court, and (2) in every iteration of the complaint, the federal claim has been inserted as the very last claim. In any event, under the circumstances, I shall not consider *sua sponte* whether the invasion of privacy claim or the interference with economic relations claim should be dismissed.

Second, Defendants have correctly noted that longstanding practice under Fed. R.Civ.P. 12(b)(6) permits a court to consider documents outside the pleadings in ruling on such a motion without converting the motion into a motion for summary judgment where such documents are "integral to and explicitly relied on in the complaint and . . . [if] the plaintiffs do not challenge [their] . . . authenticity." *Phillips v. LCI International, Inc.,* 190 F.3d 609, 618 (4th Cir.1999)(citing *Parrino v.*

---

1. Plaintiff maintains that the contents of his disciplinary file are critically important because, pursuant to state regulations, any Maryland law enforcement agency is required to inspect it in connection with any employment application Plaintiff might submit. *See* Code of Maryland Regulation 12.04.01.08(B)(1)(e)(i) and (ii) and (iii).

*FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir. 1998); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir.1996); and *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2nd Cir.1991)). Although Plaintiff does not question the authenticity of any of the several documents Defendants have attached to their third motion to dismiss, I decline to consider those documents.

It is not clear, first of all, that any of those documents are truly "integral" to Plaintiff's claims. In particular, the report of the IAD investigation and the related findings and conclusions are certainly at the center of this *case*, but that document is not the basis for Plaintiff's *claims*; rather, it is the former Commissioner's alleged lies about his interactions with Plaintiff that are at the center of Plaintiff's claims.

Moreover, the documents do not speak for themselves; arguably, they generate as many issues as they purport to resolve. For example, one of the key issues presented by Plaintiff's claims is whether Defendant Clark knowingly lied to IAD investigators. In the end, the investigators credited Clark's version of events and discredited Plaintiff's version. While this may be perfectly defensible, in a case in which Plaintiff bases all of his claims on the assertion that his superior lied about their conversation (among other things), it hardly advances Defendants' interest in seeking dismissal to assert that because the IAD investigators believed the Commissioner, rather than the Commissioner's subordinate (Plaintiff), this court should rule as a matter of law that Plaintiff's version of events is unworthy of belief. This approach is appropriate under neither Rule 12 nor Rule 56.

Finally, as to the motion exhibits, I note that Defendants (without objection from Plaintiff) have inappropriately included in the public record certain sensitive and confidential information about Plaintiff which, under current Judicial Conference policy, should *never* be filed in the public CM/ECF database. The parties are directed to confer immediately and to work with the clerk's office staff to scrub that material from the public record.

### III.

Plaintiff asserts a single federal claim under 42 U.S.C. § 1983, namely, denial of procedural due process (and a parallel claim based on the state constitution), and several state law claims, namely: (1) "wrongful discharge/abusive discharge/constructive discharge" [sic]; (2) false light invasion of privacy; (3) interference with economic relationships; and (4) intentional infliction of emotional distress. As explained below, I reject the challenge to the due process claim. On the other hand, I conclude that Plaintiff may not proceed on his claims for wrongful/constructive discharge or intentional infliction of emotional distress, and the motion shall be granted as to those claims.

### Due Process Claim

Plaintiff alleges, in part, that "[b]y failing to afford the Plaintiff a name clearing hearing ... prior to demoting him and causing damage to his good name and reputation ... [Defendants] violated the Plaintiff's rights guaranteed to him under the Fourteenth Amendment to the United States Constitution." (Second Amended Complaint at ¶¶ 35–39.)[2] To be sure,

---

2. Plaintiff elaborates that "Clark and Blackwell engaged in a vicious and malicious endeavor to destroy the Plaintiff's good name and reputation by initiating a bogus IAD investigation of the Plaintiff for wrongdoing actually committed by them, by placing a demotion in the Plaintiff's personnel and disciplinary file without affording the Plaintiff a name clearing hearing, by sustaining a trumped up IAD investigation against the

Plaintiff's due process claim is a narrow one, but a cognizable one nonetheless. Although he equivocates somewhat, Plaintiff seemingly concedes that, as a Colonel serving in a command assignment at the pleasure of the Police Commissioner, he enjoyed no procedural rights under the LEOBR. Nor did he have a property interest in his position as Colonel that is protected by the due process clause.

What Plaintiff alleges is that Defendants infringed his "Fourteenth Amendment liberty interest" in avoiding "public announcement of [false] reasons" for his demotion. *See Sciolino v. City of Newport News*, 480 F.3d 642, 645–46 (4th Cir.2007)(alteration added; internal quotation omitted). To avoid dismissal of his due process claim, Plaintiff "must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Id.* at 646.

■ In considering Defendants' previous motion to dismiss, I concluded that Plaintiff had failed to plead sufficient facts to show a "plausible" due process claim, expressing concern that Plaintiff's factual allegations surrounding his demotion were conclusory. Plaintiff's second amended complaint now contains sufficient detail. First, from the facts alleged, there is little question that Defendants publicized "stigmatizing" information about the Plaintiff. Specifically, Clark advised the media that the Plaintiff was demoted for "misconduct" surrounding the improper payment of public funds to an ineligible employee (*Id.* at ¶ 18.) Plaintiff also cites two items in the Baltimore *Sun* dated January 9, 2004, and January 28, 2004, both referencing allegations from official sources that Plaintiff

"improperly supervised and reinstated the department's former director of public affairs as a police officer." (*Id.* at ¶ 15.) A reasonable person would readily understand such a charge to "smack of deliberate fraud" and to "imply ... [a] serious character defect." *Sciolino*, 480 F.3d at 647 n. 2 (internal quotations and citations omitted). Thus, it is clear that the charges against Plaintiff which led to his demotion were "stigmatizing" within the meaning of *Sciolino* and were made public by his employer.

Furthermore, prospective employers in the law enforcement field are required under the Code of Maryland Regulations to inspect the contents of Plaintiff's disciplinary file, thus satisfying the requirement set forth in *Sciolino* "that an employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the file." *Id.* at 650.

Obviously, Plaintiff alleges that the publically disclosed stigmatizing information was false; thus, the fourth prong of the *Sciolino* test is met as well. Whether Plaintiff will be able to marshal sufficient evidence to *prove* his due process claim (and in particular, to prove the falsity of the Commissioner's charge) is quite a different question from whether he has *alleged* such a claim. Here, Plaintiff has done so.

■ Defendants' principal challenge to the due process claim focuses on the issue of whether Plaintiff's demotion was "significant," as discussed in *Ridpath v. Board of Governors*, 447 F.3d 292, 309–12 (4th Cir.2006)(applying *Stone v. University of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.

---

Plaintiff, by disseminating the sustained findings of the bogus IAD investigation to [prospective] future employers of the Plaintiff through the media, and by making the information available in the Plaintiff's disciplinary file." (Second Amended Complaint at ¶ 37.)

5 (4th Cir.1988)). In *Ridpath*, plaintiff, a Marshall University athletics department official, was reassigned from his position as Compliance Director in the Athletics Department to Director of Judicial Programs, a position for which he lacked the necessary training and qualifications. The transfer was a response to an NCAA investigation of the university for improprieties involving student athletes and recruits. *Id.* at 300. Plaintiff had been induced to accept the transfer when he was given a pay raise and was promised he would not be blamed for the apparent violations.

When, based on a report from the university, the NCAA Committee on Infractions published a report concluding that plaintiff's reassignment was part of the university's "corrective action" plan, plaintiff filed suit against numerous defendants, asserting, *inter alia*, a due process claim. *Id.* at 300–01, 308.

The district court denied defendants' motion to dismiss the due process claim on qualified immunity grounds and upon defendants' interlocutory appeal, the Fourth Circuit affirmed the denial of the motion to dismiss. The Court reasoned, in part, that even though the plaintiff was induced to accept his reassignment, he had suffered "such a change of status as to be regarded essentially as a loss of employment." *Id.* at 311 (internal quotations and citation omitted). The plaintiff's transfer was "tantamount to an outright discharge" because while his new position "may have been prized by others ... [it was] a perilous detour on his career path and, at worst, a dead end." *Id.* at 310.

*Ridpath* does not compel the conclusion, as a matter of law, that Plaintiff here did not suffer a "significant" demotion; to the contrary, in the instant case, Plaintiff has alleged facts sufficient to show he suffered a "significant" demotion. As mentioned above, although Plaintiff was not transferred to a position for which he lacked qualifications, he was demoted two ranks, *his pay was reduced by nearly $16,000,* and, although he was reduced in rank from Colonel to Major, he was tasked to do the work of a *Deputy Major.* Illuminating the allegation of a reduction in rank, the facts alleged here show that Plaintiff worked one day *as the head of an entire administrative unit of a 3200–person police force,* and the next day as merely *the second-in-command of a police district.* If what Plaintiff alleges is true, Defendants' dissemination of the details of Plaintiff's demotion and wrongdoing to the media only served to isolate him further.

Importantly, as *Ridpath* makes clear, the *circumstances surrounding a reassignment* (or, as here, a demotion) informs judicial assessment of *the gravity of the change in assignment.* See *id.* at 310 ("The Amended Complaint paints an ugly picture of the circumstances surrounding Ridpath's reassignment."). For example, in *Ridpath,* the Fourth Circuit considered the fact that the plaintiff had been falsely promised, as an inducement to accept the reassignment, that he would not be blamed for the rules violations then under investigation by the NCAA. *Id.* ("[He] was also falsely promised that he would be exonerated of blame for the athletics program infractions."). Furthermore, among other similarities to this case, Ridpath was expressly threatened, i.e., he was told "the dead limb" ("would [be] cut from the tree") if he spoke out to protest his treatment. *Id.* (alterations added). Thus, Defendants' rather sterile approach to the issue of whether Plaintiff's demotion of two ranks is "significant" misses the mark. The allegations of the second amended complaint, including the detailed exposition of the circumstances that laid the foundation for Plaintiff's demotion, fully satisfy any requirement that Plaintiff allege a "signifi-

cant" demotion. Accordingly, the motion to dismiss the due process claim is denied.[3]

### Wrongful Discharge Claim

Plaintiff's hybrid wrongful discharge claim rests on his dual assertion that: (1) his retirement amounted to a "termination," i.e., a constructive discharge, and that, so viewed, (2) termination of employment under the circumstances amounted to a cognizable wrongful discharge under Maryland law.

"[A] constructive discharge occurs ... when an employer deliberately causes or allows the employee's working conditions to become 'so intolerable' that the employee is forced into an involuntary resignation." *Beye v. Bureau of Nat'l Affairs,* 59 Md.App. 642, 651, 477 A.2d 1197 (1984). Maryland courts apply an objective standard to assess constructive discharge claims. "The applicable standard to determine if the resignation is, in effect, a constructive discharge, is whether the employer has deliberately caused or allowed the employee's working conditions to become so intolerable that a reasonable person in the employee's place would have felt compelled to resign." *Id.* at 653, 477 A.2d 1197. Although *Beye* involved a plaintiff who resigned out of fear for his safety after he reported his co-workers to the police, *id.* at 653–54, 477 A.2d 1197, claims of constructive discharge need not involve dangerous working conditions to be considered a "coercive setting." *See Staggs v. Blue Cross of Md., Inc.,* 61 Md. App. 381, 387, 486 A.2d 798 (1985).

Plaintiff's assertion that his retirement should be viewed as a constructive discharge presents a close question. If the allegations are true, a reasonable person might well find the conditions at the BPD so intolerable as to justify Plaintiff's retirement. After all, the allegations here are that the Commissioner of Police, Plaintiff's immediate superior, orchestrated a "bogus" IAD investigation against Plaintiff, motivated by a desire to divert attention from the Commissioner's own wrongdoing. This was followed by the indignity of a public demotion based on false charges, with a $16,000 loss of pay, and accompanied by a reassignment that requires one to report to a former subordinate. Manifestly, continued employment with the agency would ask an awful lot of any reasonable person who had worked for two decades to build a sound reputation as a law enforcement professional.

Nevertheless, I need not resolve this issue because I am constrained to the view that, even if Plaintiff's allegations reasonably support his claim that he suffered a constructive discharge, the facts alleged here do not support a cognizable claim for wrongful discharge under Maryland law.

Defendants urge that the decision in *Wholey v. Sears Roebuck & Co.,* 370 Md. 38, 803 A.2d 482 (2002), is fatal to Plaintiff's wrongful discharge claim. There, the Maryland Court of Appeals elaborated on the narrow public policy exception to the at-will employee doctrine it had earlier recognized. Wholey, formerly a security officer for 24 years with Sears, was promoted to Security Manager of the store. *Id.* at 43–44, 803 A.2d 482. As Security Manager his responsibilities "included in-

---

**3.** My analysis of Plaintiff's federal due process claim applies to the parallel state constitutional claim. *See Pickett v. Sears, Roebuck & Co.,* 365 Md. 67, 77, 775 A.2d 1218 (2001)("This Court has interpreted Article 24 of the Maryland Declaration of Rights and the Due Process clause of the Fourteenth Amendment of the United States Constitution to be *in pari materia,* such that the interpretations of the Due Process clause of the Fourteenth Amendment provided by the United States Supreme Court serve as persuasive authority for Article 24.").

vestigating suspicious behavior and reporting thefts of the store's merchandise by both customers and employees." *Id.* at 44, 803 A.2d 482. On several occasions he observed the store manager take goods from the store into his office, from which they would later disappear. These thefts prompted the plaintiff to report the store manager's actions to the District Manager for Security, who in turn authorized the installation of a camera, which was used to monitor the store manager's suspicious activity. *Id.* When more senior officials learned of the video surveillance of the store manager, the camera was ordered removed and the investigation of the store manager ended. Less than two months later, the plaintiff was terminated, allegedly because, *inter alia,* he had investigated, and reported on, the store manager. *Id.* at 45, 803 A.2d 482.

Wholey sued for damages based on wrongful discharge and the jury awarded him damages. On appeal by Sears, the Court of Appeals affirmed the intermediate appellate court's reversal of the judgment in favor of plaintiff.

The *Wholey* court began its analysis by stating that "[t]he tort of wrongful discharge is one exception to the well-established principle that an at-will employee may be discharged by his employer for any reason, or no reason at all." *Id.* at 49, 803 A.2d 482. In recognizing a public policy exception to the general rule governing at-will employees, the court reaffirmed the following test:

> [T]o establish wrongful discharge, the employee must be discharged, the basis for the employee's discharge must vio-

late some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee.

*Id.* at 50–51, 803 A.2d 482.

The court then turned to the particular public policy exception at issue, namely "whether a clear mandate of public policy exists in Maryland which would prohibit the discharge of an at-will employee for his investigation of suspected criminal activity of a coworker and reporting to his supervisors thereof." *Id.* at 51, 803 A.2d 482. The court concluded that certain statutory provisions relating to the reporting of criminal activity produce "a clearly definable public policy goal" whereby "the Legislature sought to protect those witnesses *who report suspected criminal activity to the appropriate law enforcement or judicial authority* from being harmed for performing this important public task." *Id.* at 59, 803 A.2d 482 (italics in original). The court explained that "[f]rom this clearly definable public policy, we are able to adopt a civil cause of action in wrongful discharge for employees who are discharged for reporting suspected criminal activity to the appropriate authorities." *Id.*[4]

Wholey's wrongful termination claim failed, however, because he had "merely investigate[d] suspected wrong-doing and discuss[ed] that investigation with co-employees or supervisors." *Id.* at 62, 803 A.2d 482 (brackets added). The court reiterated that in connection with crime-reporting activities, "[t]o qualify for the public policy exception to at-will employment, the employee must report the suspected

---

**4.** The court further explained that "while [the relevant statute] creates a criminal cause against those who retaliate against witnesses who report crimes, the tort of wrongful discharge provides a civil remedy.... Thus, we hold that terminating employment on the grounds that the employee (as a victim or witness) gave testimony at an official proceeding or *reported a suspected crime* to the appropriate law enforcement or judicial officer is wrongful and contrary to public policy." *Id.* at 60–61, 803 A.2d 482 (italics in original).

criminal activity to the appropriate law enforcement or judicial official." *Id.* The court emphasized the distinction between external reporting (which sustains a claim of wrongful discharge) and internal reporting (which, as in *Wholey,* will not sustain a claim of wrongful discharge):

> In the limited times that the Legislature has enacted whistle-blower protection to protect *private* employees, the protection is only valid when the employee/whistle-blower reports the suspect activity externally.... We believe a corresponding common law cause of action must also require external reporting to the appropriate law enforcement authorities.

*Id.* at 63, 803 A.2d 482(italics in original).

Seizing on the external/internal reporting dichotomy, Defendants argue here that Plaintiff's assertion that he reported suspected criminal wrongdoing by the Commissioner and the Deputy Commissioner to IAD does not satisfy *Wholey.* Plaintiff answers that, within the context of a law enforcement agency, and in respect to wrongdoing by the head of such an agency, resort by a high-ranking official to the "police of the police," i.e., the Internal Affairs Division, should be deemed to comply with the external reporting criterion of *Wholey.*

That is an interesting issue, but one I need not resolve. Here, one searches the factual allegations of the second amended complaint in vain for a clear statement that Plaintiff actually reported to IAD that he suspected Clark and/or Blackwell of criminal acts. Indeed, Plaintiff's allegations in this regard, such as they are, are rather incoherent. He alleges that "upon the Plaintiff's discovery and subsequent reporting that Clark, Blackwell, and possibly Averella were engaged in either misappropriation of City money or theft as alleged [earlier in the Second Amended Complaint] ... and upon learning that the Plaintiff reported the possible criminal violations to IAD of the BPD, Clark and Blackwell did in fact conspire and frame and did in fact demote and abusively and constructively discharge the Plaintiff from his employment with the BPD in contravention of the public policy of Maryland." (Second Amended Complaint, ¶ 22.)

At best, this allegation is a *non sequitur.* The second amended complaint makes clear in paragraphs 12, 13, and 14, that Plaintiff reported the results of his investigation into the Averella matter(on more than one occasion) to *Clark and Blackwell, not to IAD.* Moreover, notwithstanding the allegation in paragraph 22 that Clark and Blackwell entered into a conspiracy to "frame" Plaintiff after they learned "that the Plaintiff reported [their] possible criminal violations to IAD of the BPD," *id.,* there is no such allegation in the earlier portion of the Second Amended Complaint. According to the allegations of the second amended complaint, *Clark had already filed charges against the Plaintiff by the time Plaintiff spoke to IAD.* Thus, the allegations of the second amended complaint do not square with the requirements of *Wholey. See id.* at 62, 803 A.2d 482 ("To qualify for the public policy exception to at-will employment, the employee must report the suspected criminal activity to the appropriate law enforcement or judicial official, not merely investigate suspected wrong-doing and discuss that investigation with co-employees or supervisors.").

Apparently, Plaintiff's theory seems to be that, once the Commissioner caused an IAD investigation of *Plaintiff,* in responding to the investigators' questions (regarding Plaintiff's alleged involvement in the Averella personnel matter), *Plaintiff told the investigators that it was the Commissioner, and not he, who was the real miscreant.* I am constrained to the view that

the Maryland Court of Appeals' jurisprudence in this area does not contemplate, in its evolving refinement of the narrow public policy exception to the at-will employment doctrine, *that mere exculpatory disclosures by one who has himself (rightly or wrongly) come under suspicion and been made the target of an investigation, constitutes the "reporting" of criminal activity "to the appropriate law enforcement or judicial official."* Wholey, 370 Md. at 62, 803 A.2d 482.

■ In other words, Maryland's common law public policy exception to the at-will employment doctrine based on reporting criminal conduct surely anticipates that the employee will act seasonably and in good faith in making his report. *Cf.* ANNO., *What Constitutes Activity of Employee Protected Under State Whistleblower Protection Statute Covering Employee's "Report," "Disclosure," "Notification," or the Like of Wrongdoing–Sufficiency of Report,* 10 A.L.R.6th 531 (2006). I am convinced that the Maryland Court of Appeals would reject the proposition that an employee obtains a cause of action for wrongful discharge where, after fully discussing the facts comprising his suspicions with "co-employees or supervisors," he waits until he, himself, is placed under suspicion in respect to the same matter, and then makes exculpatory disclosures during the ensuing investigation. As a matter of law, the making of such disclosures, *motivated principally by a desire to exonerate oneself,* does not constitute "making a report" under Maryland law.

### Intentional Infliction of Emotional Distress Claim

■ I agree with Defendants that Plaintiff fails to allege a cognizable claim for intentional infliction of emotional distress. To establish a claim for intentional infliction of emotional distress, Plaintiff must demonstrate that: (1) the conduct in question was intentional or reckless; (2) the conduct was extreme and outrageous; (3) there was a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress was severe. *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (Md.1977). Maryland courts have stated that this tort "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct." *Kentucky Fried Chicken Nat. Mgmt. Co. v. Weathersby,* 326 Md. 663, 669, 607 A.2d 8 (Md.1992).

■ Here, it is apparent that the treatment Plaintiff endured, as unpleasant as it was, was not so extreme and outrageous as to be regarded as beyond the bounds of decency under Maryland law. *Id.* Furthermore, Plaintiff has not shown that he suffered such a severe, disabling emotional response "that no reasonable person could be expected to endure it." *Id.* at 679, 607 A.2d 8. Thus, the claim for Intentional Infliction of Emotional Distress is dismissed.

### IV.

For the reasons stated above, Defendants' Motion to Dismiss is GRANTED in part and DENIED in part. Defendants shall file their answers to the surviving counts of the second amended complaint on or before July 31, 2008. Discovery shall commence immediately.

SO ORDERED.