**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-1847**

THOMAS M. CANNON; JESSE M. CONNER; DONALD M. KOONS;
NICHOLAS M. TERRELL,

Plaintiffs – Appellees,

v.

VILLAGE OF BALD HEAD ISLAND, NORTH CAROLINA; CALVIN R.
PECK, JR., in his individual capacity; CAROLINE MITCHELL, in her individual
capacity,

Defendants – Appellants.

Appeal from the United States District Court for the Eastern District of North Carolina, at
Wilmington. Malcolm J. Howard, Senior District Judge. (7:15-cv-00187-H)

Argued: February 28, 2018                                      Decided: May 30, 2018

Before DUNCAN, AGEE, and WYNN, Circuit Judges.

Dismissed in part, affirmed in part, and reversed and remanded in part by published
opinion. Judge Wynn wrote the opinion, in which Judge Duncan and Judge Agee joined.

**ARGUED:** Norwood Pitt Blanchard, III, CROSSLEY MCINTOSH COLLIER
HANLEY & EDES PLLC, Wilmington, North Carolina, for Appellants. Bradley
Andrew Coxe, HODGES COXE POTTER & PHILLIPS, LLP, Wilmington, North
Carolina, for Appellees. **ON BRIEF:** Samuel B. Potter, HODGES COXE POTTER &
PHILLIPS, LLP, Wilmington, North Carolina, for Appellees.

WYNN, Circuit Judge:

In August 2014, the Village of Bald Head Island, N.C. ("Bald Head"), fired Plaintiffs Thomas Cannon, Jesse Conner, Donald Koons, and Nicholas Terrell (collectively, the "Officers")—who worked for Bald Head's Department of Public Safety (the "Department")—for the content of messages the Officers sent in a private text-message chain. Approximately one year later, the Officers filed suit against Bald Head, its town manager Calvin Peck ("Peck"), and its director of public safety Dr. Caroline Mitchell ("Mitchell," and collectively with Bald Head and Peck, "Defendants"), asserting that the terminations violated their First Amendment rights, and that subsequent public disclosures by Bald Head explaining the bases for the terminations constituted defamation and violated the Officers' Fourteenth Amendment rights to procedural due process. After the parties completed discovery, Peck and Mitchell, who were responsible for the firings and subsequent disclosures, unsuccessfully moved to dismiss the Officers' constitutional claims on the basis of qualified immunity.

For the reasons that follow, we affirm the district court's denial of qualified immunity regarding the alleged due process violations. However, we conclude that the district court erred in holding that Peck and Mitchell were not entitled to qualified immunity as to the Officers' First Amendment retaliation claims. In particular, the Officers' evidence does not establish beyond debate that the Officers' interest in speaking freely outweighed the Department's interest in maintaining order and discipline. Accordingly, we affirm in part, reverse in part, and remand the case to the district court for further proceedings consistent with this opinion.

I.

A.

The Department combines Bald Head's firefighting, paramedic, and police departments in a single multi-disciplinary group of emergency personnel. From July 25 to August 15, 2014, the Officers engaged in a group text-message chain with several other members of the Department. The group text messages discussed a wide variety of topics. A number of messages concerned a local news article, which was published on August 6, in which Mitchell reportedly said that all but two officers in the Department were certified to perform the four emergency services for which the Department is responsible: firefighting, emergency medicine, water rescue, and law enforcement. Many of the Officers questioned the veracity of that claim, identifying a number of Department employees who lacked one or more of the certifications. And several messages expressed concern that the Department was providing inadequate training to public safety officers. *See* J.A. 322 (Officer Conner expressing concern that staff is not "doing first in engine drills"); *id.* (Officer Terrell expressing concern that Department official responsible for training only sends officers to law enforcement training, not the training required for the other services provided by the Department).

Messages in the chain also questioned certain officers' competence to perform various emergency services. For example, Officer Conner expressed concern about the Department's lack of "worr[y] that people who claim to be ems can't take a blood pressure" or that employees engaged in firefighting "have no real fire experience" and had not attended "a controlled training burn." *Id.* In addition to the messages

3

questioning Mitchell's representations regarding the Department's training, several other messages questioned the Department's leadership. For example, Officer Terrell questioned the decision to promote another officer, Robin Wallace, to lieutenant, suggesting that Wallace lacked the ability to form a "plan of attack" to respond to a fire, medical emergency, or water rescue call. J.A. 342.

A number of the text messages also discussed non-safety-related topics, including workout tips, sexual gibes, and former coworkers. Several messages joked about hypothetical situations in "Colorado," which referred to Mitchell, who previously lived in Colorado. J.A. 324–25. And one message, which was sent by an officer who is not a party to this action, included an image of a police officer with the meme: "Who am I? I'm the dude, playing a dude, disguised as another dude"—a reference to the movie *Tropic Thunder*. J.A. 340. That message elicited no response from anyone else on the text-message chain.

Mitchell learned of the text-message chain during a meeting with another public safety officer, Nick Hiatt ("Hiatt"), who also participated in the chain. There is a dispute of fact as to why Hiatt disclosed the text-message chain to Mitchell. According to Mitchell, Hiatt showed her the text messages while lodging a complaint that the Officers were acting unprofessionally and engaging in "harass[ment]." J.A. 209–10. By contrast, Hiatt averred that he "never made a complaint about the text messages," J.A. 307, and that he "did not indicate to . . . Mitchell that [he] was offended, sexually harassed, [or] upset, or that [he] felt that the work environment was hostile or offensive," J.A. 304. Rather, Hiatt further averred that he showed Mitchell the text messages in order to

4

demonstrate that "management and the rank and file employees and public safety officers did not have a good relationship; did not have good communication; did not have clear understandings of job duties and responsibilities; did not all have proper training; and [that he thought] this affected the public's safety." J.A. 303.

After obtaining a copy of the text-message chain, Mitchell consulted other members of the Department's command staff. Several members of the command staff expressed concern that certain messages in the chain seemed to derogatorily joke about Mitchell's sexual orientation, most notably the *Tropic Thunder* message. After receiving the command staff's input, Mitchell showed Peck the text-message chain and recommended terminating the Officers and one of their coworkers.

Peck agreed with Mitchell's recommendation to terminate the officers, largely because Peck "felt that the [text-message] conversation displayed a clear tone of hostility and insubordination towards . . . Mitchell and the other members of the command staff." J.A. 61; *see also* J.A. 164 ("[The Officers] were terminated because they were jerks. . . . [T]hey were disrespectful . . . of the chain of command."). Mitchell testified that she recommended terminating the Officers solely because she did not "want [the Officers] to be part of our [Department's] team." J.A. 220. She further testified that she did not make any other specific recommendation as to why the Officers should be fired.

After Peck and Mitchell decided to terminate the Officers, Bald Head's human resources director, Karen Williams, provided Peck and Mitchell with potentially relevant sections of Bald Head's personnel policy. Williams testified that Peck and Mitchell then "picked which [provisions in the personnel policy] applied to which officers." J.A. 403.

5

After Peck and Mitchell "[c]onveyed those [choices] to [Williams], [Williams] drafted the [termination] letters based on [Peck and Mitchell's] direction." *Id.*

On August 28, 2014, Peck, Mitchell, and another member of the Department's command staff met with Officers Conner, Koons, and Terrell, and informed each Officer that he had been terminated by an immediate, final decision for participating in the text-message chain. Officer Cannon was unable to attend an in-person meeting, and therefore was fired by phone instead.

During the meetings, the Department provided each Officer with a termination letter listing various Bald Head policy violations. Each officer was terminated for "discourteous treatment of other employees" and "inappropriate electronic communications." J.A. 147–50. Officers Cannon, Koons, and Terrell also were terminated for "harassment." J.A. 147, 149, 150. And Officers Koons and Terrell were terminated for "sexual harassment" as well. J.A. 149–50. Each letter additionally indicated that the Officers' actions qualified as "detrimental personal conduct," which "is . . . grounds for immediate termination" under Bald Head policy. J.A. 147–50. The day after the Officers' termination, local media requested copies of the letters, which Williams turned over because she believed doing so was necessary to comply with North Carolina's Public Records Act.

Several hours after the Officers' termination, Peck sent an email to all of Bald Head's full-time employees and all of the Department's part-time employees, which stated that "five officers have been released from employment . . . based on violations of [Bald Head's] policies pertaining to harassment, sexual harassment, discourteous conduct

6

and inappropriate electronic communications." J.A. 451. The email did not differentiate between each Officer's alleged policy violations. Additionally, Peck included the full text of Bald Head's policy regarding "[d]etrimental personal conduct"—one of the violations listed in all the Officers' termination letters—which is defined as "behavior of such a serious detrimental nature that the functioning of [Bald Head] may be or has been impaired; the safety of persons or property may be or have been threatened; or the laws of any government may be or have been violated." *Id.*

The next day, August 29, 2014, Mitchell filled out an affidavit of separation, or "Form F-5B," regarding each Officer's termination and, as required by law, submitted them to the North Carolina Criminal Justice Education and Training Standards Commission. Notwithstanding that the termination letters offered different grounds for terminating several of the Officers, on each Officer's Form F-5B Mitchell provided the same reason for termination: that "[a] complaint was filed with this agency . . . involving inappropriate electronic communications that created a hostile work environment in violation of [Bald Head] policy." J.A. 268–75.

That same day, Officers Conner, Koons, and Terrell each sent a grievance letter to Peck, stating that "the grounds for which I was terminated were unfair and . . . my job performance and personal conduct were not accurately represented." J.A. 278–80. Peck responded that "[t]here is no right to a grievance or appeal process." J.A. 300–02.

7

## B.

Approximately one year after the firings, on August 26, 2015, the Officers filed the instant suit alleging, among several other claims, that Defendants violated (1) the First Amendment, by firing the Officers for engaging in speech on matters of public concern; (2) the Fourteenth Amendment, by failing to afford the Officers due process before publicly disclosing information that placed a stigma on their reputations, and (3) state law, by defaming the Officers.

On October 7, 2016, Peck and Mitchell moved for summary judgment, arguing that qualified immunity barred the Officers' First Amendment retaliation and Fourteenth Amendment due process claims. Defendants also moved for summary judgment on the Officers' defamation claims, on grounds that the Officers' evidence failed to create a triable issue of fact as to whether Defendants acted with actual malice in disclosing information regarding the Officers' termination. Peck and Mitchell also subsequently argued that their recent offer to conduct a name-clearing hearing mooted the officers' request for injunctive relief.

In an opinion and order entered June 22, 2017, the district court granted summary judgment to Defendants on Officer Cannon's First Amendment retaliation claim, but held that qualified immunity did not bar the remaining First and Fourteenth Amendment claims. *Cannon v. Vill. of Bald Head Island, N.C.*, No. 7:15-CV-187, 2017 WL 2712958, at *20 (E.D.N.C. June 22, 2017). The district court also declined to dismiss the Officers' defamation claims and request for injunctive relief. *Id.* Defendants timely appealed those decisions.

8

II.

On appeal, Defendants assert that the district court erred in (A) denying Peck and Mitchell qualified immunity on the Officers' First Amendment retaliation claims; (B) denying Peck and Mitchell qualified immunity on the Officers' Fourteenth Amendment claims; (C) denying Defendants' summary judgment motion as to the Officers' defamation claims; and (D) refusing to dismiss as moot the Officers' request for injunctive relief regarding their Fourteenth Amendment claims. Given that this appeal arises from the district court's denial of summary judgment, we review each issue de novo, viewing all facts and reasonable inferences therefrom in favor of the Officers, as the non-moving party. *Hunter v. Town of Mocksville, N.C.*, 789 F.3d 389, 395–96 (4th Cir. 2015).

As noted above, Defendants' first two arguments require this Court to determine whether Peck and Mitchell are entitled to qualified immunity. "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To overcome qualified immunity, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

For a right to be clearly established, there need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond

9

debate." *Id.* at 741. Put differently, "a constitutional right is clearly established when 'its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006) (alteration in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

A.

Defendants first argue that the district court erred in denying Peck and Mitchell qualified immunity from the Officers' First Amendment retaliation claim. As government employees, the Officers did "not relinquish all First Amendment rights otherwise enjoyed by citizens just by reason of [their] employment." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam). That being said, "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *Id.*

When, as here, a government employee claims that he was terminated "because of his speech, we use a three-prong test to determine if the employee's rights under the First Amendment were violated." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 470 (2017). In particular, we must determine: "(1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision." *McVey v. Stacy*,

157 F.3d 271, 277–78 (4th Cir. 1998). "Because the first two prongs of the test are questions of law, an employer is entitled to qualified immunity if either prong cannot be resolved under clearly established law." *Crouse*, 848 F.3d at 583.

Peck and Mitchell do not dispute that the Officers' speech was a "substantial factor" in their termination. Rather, Peck and Mitchell argue that at the time of the Officers' termination, it was not clearly established that the statements in the Officers' text-message chain amounted to speech on a "matter of public concern," and, even if the text-message chain included speech on a matter of public concern, it was not clearly established that the Officers' interest in engaging in such speech outweighed Defendants' countervailing interest in order and discipline. Because ultimately we agree with Defendants' latter argument, we assume without deciding that the Officers' speech addressed matters of public concern.

In addressing Defendants' latter argument, we must determine whether it was clearly established that the Officers' interest in First Amendment expression outweighed Defendants' interest in maintaining order and discipline within the Department. *See Pickering v. Bd. of Educ. of Twp. High School Dist. 205*, 391 U.S. 563, 568 (1968) (holding that in First Amendment retaliatory discharge case, a court must balance "the interests of the [public employee], as a citizen, in commenting on matters of public

11

concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees").[1]

In analyzing that question, "'we must take into account the context of the employee's speech' and 'the extent to which it disrupts the [Department's] operation and mission.'" *Ridpath*, 447 F.3d at 317 (quoting *McVey*, 157 F.3d at 278). To guide our inquiry, we have identified the following relevant factors:

> whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

*Id.* (citing *McVey*, 157 F.3d at 278); *see also id.* at 317 n.28 (noting that another relevant factor may be "the value of the employee's speech to the public").

As the multi-factorial test suggests, we have recognized that *Pickering*'s "particularized balancing . . . is subtle [and] difficult to apply." *Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996) (internal quotation marks omitted). "[B]ecause of the 'sophisticated balancing' involved in First Amendment questions, 'only infrequently will it be clearly established that a public employee's speech on a matter of public concern is constitutionally protected.'" *Ridpath*, 447 F.3d at 320 (quoting *McVey*, 157 F.3d at 277).

---

[1] Because we conclude it was not clearly established that the Officers' interest in speaking outweighed the Defendants' interests in maintaining discipline, we need not— and thus do not—address whether the *Pickering* balancing favored the Officers.

That said, on several occasions we have concluded the interests weighed so heavily in a discharged employee's favor that the employee's right to speak on a matter of public concern was clearly established at the time of his termination. *See id.* at 320–21; *Cromer*, 88 F.3d at 1327.

Acknowledging that the fact-specific nature of the *Pickering* inquiry often leads courts to conclude that a defendant is entitled to qualified immunity from a First Amendment retaliation claim, the district court nonetheless held that this Court's opinions in *Cromer* and *Ridpath* clearly established that the balance of interests weighed in the Officers' favor. *Cannon*, 2017 WL 2712958, at *15–16. *Cromer* involved a police department that demoted, and later terminated, a black police officer after the officer signed on to an anonymous letter alleging, among other claims, that the department leadership displayed "a High level of insensitivity toward Black officers," followed "certain unwritten policies in the department [that] were inhibit[ing] the advancement of Black officers," and otherwise subjected black officers to unequal treatment, thereby posing a risk to public safety. 88 F.3d at 1320 (second alteration in original) (internal quotation marks omitted). This Court concluded that the officer's interest in raising concerns about discrimination within the department "merged" with the public's "substantial" interests in having a police force free of broad-based discrimination, and therefore "weigh[ed] heavily" in the officer's favor. *Id.* at 1327. By contrast, we held that, under the facts of the case, the police department's asserted interests in "discipline, morale and good working relationships" warranted "little or no" weight. *Id.* at 1329. In finding that those interests warranted little to no weight, we emphasized that "[t]he letter

was not insubordinate or rebellious in tone, and there was no public display of disobedience or protest," and that the letter had little impact on office morale, which "was already low." *Id.* at 1328.

There are several material differences between the instant case and *Cromer* that preclude *Cromer* from clearly establishing that the balance of interests weighs in the Officers' favor here. To begin, unlike the letter at issue in *Cromer*—which both aspired to bring to the police department's leadership concerns about discriminatory treatment and made specific suggestions about how the department could improve its treatment of black officers, *see id.* at 1320–21—the Officers here did not voice their concerns to Department leadership, nor did the text messages seek to effect change in the Department or otherwise rectify the safety deficiencies. Additionally, unlike the letter at issue in *Cromer*, the text-message chain included messages that arguably were "insubordinate or rebellious." *Id.* at 1328. In particular, the text-message chain included messages that suggested an officer had been promoted in return for providing sexual favors, messages that questioned Mitchell's truthfulness and leadership, and messages that questioned the competency of a recently promoted co-worker. *Cannon*, 2017 WL 2712958, at *2–5. Several Officers replied favorably to these messages. And another message in the chain, which was not sent by a Plaintiff, also joked about Mitchell's sexual orientation. *Id.* at *5. This Court previously has recognized that, even when, as here, employee speech serves a "limited first amendment interest," public employers need not "tolerate associated behavior that they reasonably believed was disruptive and insubordinate." *Dwyer v. Smith*, 867 F.2d 184, 194 (4th Cir. 1989). These differences have a sufficiently

14

significant impact on the balancing equation such that we cannot say that *Cromer* clearly established that the balance of interests weighed in the Officers' favor.

*Ridpath*, which addressed qualified immunity in the context of a motion to dismiss, is even more factually and legally dissimilar. There, a public university relieved its athletics compliance director of teaching duties, allegedly because, during a National Collegiate Athletics Association ("NCAA") investigation, the compliance director brought to light violations of NCAA rules by the university and questioned the university's handling of those violations. *Ridpath*, 447 F.3d at 317. We concluded that "NCAA rules violations by a prominent sports program at a major public university, and the nature of the university's handling of such allegations, are matters of great social, political, or other interest to a community." *Id.* (internal quotation marks omitted). Furthermore, we emphasized that nothing in the complaint indicated that the compliance director's "comments impaired the maintenance of discipline, hurt workplace morale, or constituted an abuse of his position." *Id.* at 318. Accordingly, we concluded that the compliance director's "allegations warrant the inference that his free speech interests outweigh the detrimental effect." *Id.*

For several reasons, *Ridpath* did not clearly establish that the *Pickering* balancing weighs in the Officers' favor here. First, *Ridpath* involved a motion to dismiss, not a motion for summary judgment. Accordingly, *Ridpath* assessed the *Pickering* balancing in absence of any evidence rebutting the alleged lack of impact on workplace discipline and morale. *Id.* By contrast, evidence adduced during discovery in this case, such as the text-message chain, which included messages that were arguably insubordinate and

15

discriminatory, suggested that the messages adversely impacted discipline. *See Cannon*, 2017 WL 2712958, at \*2–5; *see also* J.A. 303 (Hiatt averring that he showed the text-message chain to Mitchell in part to demonstrate that "management and the rank and file employees and public safety officers did not have a good relationship [and] did not have good communication"). Additionally, whereas *Ridpath* involved a university employee, the instant case involves public safety officers. This Court has recognized on several occasions that "police officials are entitled to impose more restrictions on speech than other public employers because a police force is '"paramilitary"—discipline is demanded, and freedom must be correspondingly denied.'" *Brickey v. Hall*, 828 F.3d 298, 304 (4th Cir. 2016) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 300 (4th Cir. 1992)). Taken together, these differences preclude *Ridpath* from constituting clearly established law regarding the outcome of the particularized balancing that *Pickering* demands under the facts of this case.

Accordingly, neither *Cromer* nor *Ridpath* rendered it "beyond debate," *al-Kidd*, 563 U.S. at 741, that the balance of interests weighs in the Officers' favor here. We therefore reverse the district court's determination that Peck and Mitchell were not shielded by qualified immunity from the Officers' First Amendment retaliation claims.

16

B.

We now turn to the district court's denial of qualified immunity to Peck[2] regarding the Officers' due process claims, *i.e.*, that Peck violated the Fourteenth Amendment by failing to afford the Officers adequate process before publicly disclosing the reasons for their discharge. Public employees, even when lawfully discharged, enjoy the "freedom to take advantage of other employment opportunities." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972). This includes the right to be "free from arbitrary restrictions upon the opportunity for other gainful employment stemming from the reasons voluntarily given by government for lawfully terminating . . . at-will public employment." *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990) (alteration in original) (quoting *Boston v. Webb*, 783 F.2d 1163, 1167 (4th Cir. 1986)). "'[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him,'" *Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (quoting *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)), the due process requirements of "notice and opportunity to be heard are essential." *Constantineau*, 400 U.S. at 437. Accordingly, as to public employees, "a Fourteenth Amendment 'liberty interest is implicated by public announcement of reasons for an employee's discharge.'" *Sciolino*, 480 F.3d at 645–46 (quoting *Johnson*, 903 F.2d at 999).

---

[2] Although Peck and Mitchell together argue they are entitled to qualified immunity regarding the Officers' due process claims, below Mitchell argued that she was entitled to qualified immunity solely regarding the Officers' First Amendment claims. (Continued)

There are two components to a claim that a governmental employer violated a former employee's Fourteenth Amendment rights by publicly disclosing the reasons for the employee's discharge. *See Segal v. City of N.Y.*, 459 F.3d 207, 213 (2d Cir. 2006). First, the employee must establish that he has been deprived of a liberty interest, and does so by demonstrating that the charges against him by his governmental employer: "(1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Sciolino*, 480 F.3d at 646 (citing *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988)).

Second, the employee "must demonstrate that [his] liberty was deprived without due process of law." *Segal*, 459 F.3d at 213. To that end, the Supreme Court has recognized that, when a governmental employer places an employee's reputation "at stake" by publicly disclosing defamatory charges, "notice and opportunity to be heard are essential." *See Roth*, 408 U.S. at 573 (quoting *Constantineau*, 400 U.S. at 437). Such a hearing allows a former employee "to 'clear [his] name' against [the] unfounded

---

*See Cannon et al. v. Vill. of Bald Head*, 7:15-cv-00187-H, ECF No. 47, at 8–10. The district court therefore only addressed *Peck's* entitlement to qualified immunity regarding the Officers' due process claims. *Cannon*, 2017 WL 2712958, at \*17, \*19. For these reasons, we decline to consider Mitchell's qualified immunity arguments for the first time on appeal, including those regarding the Forms F-5B she filled out and filed with the North Carolina Criminal Justice Education and Training Standards Commission. *See, e.g.*, *CoreTel Va., LLC v. Verizon Va., LLC*, 808 F.3d 978, 988 (4th Cir. 2015) ("[I]f a party wishes to preserve an argument for appeal, the party must press and not merely intimate the argument during the proceedings before the district court.").

18

charges." *Johnson*, 903 F.2d at 999 (quoting *Boston*, 783 F.2d at 1167). In the context of a claim that a governmental defendant violated a former employee's Fourteenth Amendment rights by publicly disclosing the reasons for the employee's discharge, as here, this Court has held that this opportunity to be heard "must be granted at a meaningful time." *Sciolino*, 480 F.3d at 653 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). This is because, as we further held, "[a]n opportunity to clear your name *after* it has been ruined by dissemination of false, stigmatizing charges is not 'meaningful.'" *Id.* (emphasis added).

With this legal framework in mind, we now must determine (1) whether, under clearly established law, the Officers were deprived of a protected liberty interest and (2) if so, whether, under clearly established law, the Officers were deprived of that interest without due process of law.

1.

To determine whether the Department deprived the Officers of a protected liberty interest, we first must determine whether the challenged disclosures "placed a stigma on [the Officers'] reputation[s]." *Id.* at 646. For over thirty years, this Court has held that a governmental disclosure places a stigma on a former employee sufficient to give rise to a liberty interest claim if it "implies 'the existence of serious character defects such as dishonesty or immorality.'" *Ridpath*, 447 F.3d at 308 (quoting *Robertson v. Rogers*, 679 F.2d 1090, 1092 (4th Cir. 1982)); *accord Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555, 558 (4th Cir. 1976).

19

Here, the Officers' termination letters and the email to all Bald Head employees regarding the Officers' termination included allegations of "harassment," "sexual harassment," and "detrimental personal conduct." *Cannon*, 2017 WL 2712958, at *17. As explained in the email to Bald Head employees, Bald Head's personnel policy manual provides that "[d]etrimental personal conduct" is "behavior of such a serious detrimental nature that the functioning of [Bald Head] may be or has been impaired; the safety of persons or property may be or has been threatened; or the laws of any government may be or have been violated." J.A. 451. Accordingly, "harassment," "sexual harassment," and "detrimental personal conduct" amount to "significant character defects," such as "immorality," *Ridpath*, 447 F.3d at 309, and therefore stigmatize the Officers' reputation in a constitutionally cognizable manner. Additionally, the Officers' evidence shows that after the Department released the relevant documents, each Officer either had difficulty securing a job or accepted a job with less significant responsibilities and lower pay, thereby creating a reasonable inference that the claims in the termination letters did, in fact, place a stigma on the Officers' reputations with prospective employers.

Peck argues that the disclosures did not impose a constitutionally cognizable "stigma" on the Officers' reputations because the allegations in the letters did not "effectively foreclose [the Officers] from finding future public employment." Appellants' Br. 40–41 (noting that, as a matter of fact, the Officers later "secured . . . employment"). But in *Sciolino* this Court held that "[a] public employer who fires . . . an employee in a manner that sullies the employee's good name and *restricts* his future employment opportunities deprives him of important liberty interests protected by the

20

Fourteenth Amendment." 480 F.3d at 649 (emphasis added). Likewise, in *Ledford v. Delancey* this Court recognized a liberty interest claim based on the inclusion of allegedly defamatory charges in an employee's personnel file when the charges "*impaired* his ability to procure other employment." 612 F.2d 883, 885, 886–87 (4th Cir. 1980) (emphasis added). And in *Ridpath*, this Court held that a demoted public employee stated a Fourteenth Amendment liberty interest claim, notwithstanding that the employee continued to hold public employment at the time he brought the claim. *See* 447 F.3d at 309–10. Accordingly, this Court does not—and has not—required that a disclosure "effectively foreclose" future public employment for the disclosure to be actionable under the Fourteenth Amendment.

This Court decided *Sciolino*, *Ledford*, *Ridpath*, and the other cases cited above years before the Department discharged the Officers and disclosed the grounds for their termination. Accordingly, under our qualified immunity analysis, it was clearly established at the time of the disclosures that the disclosed allegations would place a constitutionally cognizable stigma on the Officers' reputations.

Second, we turn to the liberty interest requirement "that the charges against [the Officers] . . . were made public by the employer." *Sciolino*, 480 F.3d at 646. In *Sciolino*, this Court held that to satisfy the public disclosure requirement "an employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the [stigmatizing] file." *Id.* at 650.

The district court found—and we agree—that, under the *Sciolino* standard, Peck made public the charges against the Officers in several ways, including by sending the

Officers' termination letters to the news media and sending the email to all full-time Bald Head employees and part-time Department personnel stating that the Officers were terminated for "harassment," "sexual harassment," and "detrimental personal conduct." *Cannon*, 2017 WL 2712958, at \*17–18.

Peck argues that, at the time of the Officers' discharge, this Circuit's precedent did not clearly establish that Defendants made the charges "public" because "the North Carolina Public Records Act and N.C. Gen. Stat. § 160A-168(b)(11) required [Defendants] to produce [the Officers'] termination letter[s]," rendering the disclosures non-"voluntary" and thereby not in contravention of due process. Appellants' Br. 40. We disagree. In particular, Peck's voluntariness argument applies to the disclosure of the termination letters to the media *only*. Accordingly, even if Peck is correct that it was not clearly established that the disclosure to the media of the termination letters amounted to a liberty interest deprivation, it would in no way preclude the Officers' Fourteenth Amendment claims from proceeding against Peck based on the email he voluntarily disseminated to all Bald Head employees. Additionally, there is no dispute that Defendants placed the termination letters in the Officers' personnel files, meaning that any prospective employer who sought and received the Officers' personnel files would receive the termination letters.

Recall that *Sciolino* held that a discharged employee must demonstrate "a *likelihood* that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the [stigmatizing] file." *Sciolino*, 480 F.3d at 650 (emphasis added). Likewise, *Ledford* established that discharged governmental employees, like the

22

Officers, have "a right that [their] personnel file contain no substantially false information with respect to [their] work performance or the reasons for [their] discharge when that information *is available* to prospective employers." 612 F.2d at 887 (emphasis added).

This Court decided *Sciolino* and *Ledford* years before Defendants discharged the Officers and disclosed the termination letters and sent the email regarding the terminations to all Bald Head employees. Accordingly, notwithstanding Peck's disclosure to the media of the Officers' termination letters, the availability upon request of those same letters from the Officers' personnel file may give rise to a constitutionally cognizable public disclosure. *Sciolino*, 480 F.3d at 650. And, regardless, the district court was correct in concluding that "Peck's email to all [Bald Head] employees and part-time staff of the department of public safety was voluntarily sent without any request for the information." *Cannon*, 2017 WL 2712958, at *18. In sum, under our qualified immunity analysis, at the time of the disclosures this Court's precedent clearly established that the allegedly stigmatizing statements were made public by Peck.

With the first two liberty interest requirements satisfied, Peck concedes that the Officers' evidence satisfied the third *Sciolino* element—that the stigmatizing statements were made in conjunction with the Officers' termination. Accordingly, the remaining inquiry focuses on the fourth *Sciolino* element—whether the Officers' evidence established that the "the charges against [the Officers] . . . were false." 480 F.3d at 646. According to Peck, the Officers failed to demonstrate the disclosures were "false" "because there is no dispute about what [the Officers] actually said—the only 'dispute'

23

[the Officers] are raising is over whether they agreed with . . . Peck's interpretation of [Bald Head]'s Personnel Policy provisions which were cited in [their] termination letter[s]." Appellants' Br. 38.

In support of this argument, Peck relies on the Supreme Court's decision in *Codd v. Velger*, 429 U.S. 624 (1977) (per curiam). There, a discharged police patrolman alleged that the New York City police department placed stigmatizing information in his personnel file without providing him procedural due process. *Id.* at 624–26. According to a record in the file, the department discharged the officer "because while still a trainee he had put a revolver to his head in an apparent suicide attempt." *Id.* at 626. Notwithstanding that the officer's counsel suggested in argument that the "attempt" "might have been all a mistake, [i]t could also have been a little horseplay," *id.* at 628 (alteration in original), the Court held that there was no "factual dispute" because "[n]owhere in his pleadings or elsewhere has [the officer] affirmatively asserted that the report of the apparent suicide attempt was substantially false," *id.* at 627.

Contrary to Peck's argument, *Codd* has no bearing on this case. As the district court correctly explained, "here the falsity alleged is not the falsity of the characterization of the conduct or speech of [the Officers], but rather the falsity of the reasons for terminating [the Officers] as listed in the termination letters [and] email." *Cannon*, 2017 WL 2712958, at *18.

The district court further concluded—and we agree—that the Officers repeatedly have alleged that the termination letters and the email to Bald Head employees include false statements. *See id.* And the Officers adduced substantial evidence to support their

24

assertions that the stigmatizing statements in the disclosures were, in fact, false. For example, the termination letters and email to Bald Head staff state that Defendants fired the Officers for violations of Bald Head's Personnel Policy—including engaging in "harassment," "sexual harassment," "detrimental personal conduct," and creating a "hostile work environment." Yet, Peck testified that he terminated the Officers "*[w]hether or not there was any specific policy* . . . because that behavior has no place in the Public Safety Department of Bald Head Island." J.A. 164 (emphasis added). "[They] were terminated because they were jerks" and because they "were disrespectful . . . of the chain of command." *Id.* Accordingly, there is a dispute of fact as to whether the stigmatizing reasons given in the several disclosures were, in fact, the reasons Defendants terminated the Officers.

Further, Peck's email to the Bald Head employees stated that "five officers have been released from employment this morning based on violations of [Bald Head] policies pertaining to harassment, sexual harassment, discourteous conduct and inappropriate electronic communications," J.A. 451, thereby suggesting that Defendants fired the Officers for the same reasons. Yet, the termination letters for some of the officers do not mention "harassment" or "sexual harassment," and none of the Officers' Forms F-5B mentions "harassment" or "sexual harassment." Indeed, the reasons provided in the termination letters, the Forms F-5B, the email to Bald Head employees, and Peck's testimony are inconsistent with each other, meaning that the Officers have satisfied their burden to create a triable issue of fact as to whether the stigmatizing disclosures were false.

25

\* \* \* \* \*

In sum, we conclude that under clearly established precedent, Peck made public false and stigmatizing charges regarding the grounds for the Officers' termination. This satisfies *Sciolino*'s four prongs, thus demonstrating deprivation of the Officers' constitutionally cognizable liberty interests under clearly established law.

2.

Having concluded that this Court's decisions clearly established that Peck deprived the Officers of a liberty interest, we now must determine whether, under clearly established law, the Officers were deprived of that interest "without due process of law." *Segal*, 459 F.3d at 213. As explained above, when a governmental employer places an employee's reputation "at stake" by publicly disclosing defamatory charges, the employee is entitled to a hearing "to 'clear [his] name' against [the] unfounded charges." *Johnson*, 903 F.2d at 999 (quoting *Boston*, 783 F.2d at 1167). Here, the Officers *never* received a name-clearing hearing. Accordingly, Peck has denied the Officers due process of law.

Peck nonetheless asserts that the failure to afford the Officers a name-clearing hearing does not amount to a violation of clearly established law for two reasons: (1) he "w[as] not required to provide [the Officers] with an adversarial pre-termination hearing," Appellants' Br. 42, and (2) "[the Officers] had alternative processes to contest the contents of the termination letter[s]," *id.* at 41. We disagree.

We note at the outset that Peck did not argue before the district court that he did not need to provide an adversarial pre-termination name-clearing hearing. Because Peck

did not raise that argument below, it is not properly before us. *See, e.g.*, *CoreTel Va., LLC*, 808 F.3d at 988.[3]

Nevertheless, even if Peck had properly raised that argument, it would fail. In *Sciolino*, this Court clearly established that "[a]n opportunity to clear your name *after* it has been ruined by dissemination of false, stigmatizing charges *is not* '*meaningful*.'" *Sciolino*, 480 F.3d at 653 (emphases added); *see also Fields v. Durham*, 909 F.2d 94, 97 (4th Cir. 1990) ("[T]he Due Process Clause normally requires a hearing '*before* the State deprives a person of liberty or property.'" (quoting *Zinermon v. Burch*, 494 U.S. 113, 127 (1990))). Accordingly, regardless whether the Fourteenth Amendment obliged Defendants to afford the Officers an adversarial, *pre-termination* name-clearing hearing, *Sciolino* established that the Fourteenth Amendment required Defendants to afford the Officers a constitutionally adequate name-clearing hearing before *publicly disclosing* false information regarding the basis for the Officers' termination that, in fact, restricted their ability to obtain new employment.

---

[3] For the same reason, we decline to address Peck's argument that Officer Cannon's liberty interest claim "fail[s] because he never requested a hearing." Appellants' Br. 48. Rather than asserting that Officer Cannon's liberty interest claim failed because he did not request a hearing, Peck argued below that the Officers' "request for a grievance hearing did not put [Bald Head] on notice that they wanted a 'name clearing hearing,' as opposed to a grievance seeking reinstatement." *Cannon et al. v. Vill. of Bald Head*, 7:15-cv-00187-H, ECF No. 48, at 22. The district court denied summary judgment on that ground. *Cannon*, 2017 WL 2712958, at *19 ("[T]he clarity of the [name-clearing hearing] request after dissemination of false, stigmatizing charges is not dispositive."). Peck does not challenge that conclusion on appeal.

27

Peck's second argument pertaining to the adequacy of the process afforded—that an alternate state-law process provided the Officers an opportunity to contest the claims in the termination letters—fares no better. The state statute upon which Peck relies, N.C. Gen. Stat. § 160A-168(d), requires municipalities to "establish procedures whereby an employee who objects to material in his [personnel] file on grounds that it is inaccurate or misleading may seek to have the material removed from the file or may place in the file a statement relating to the material." Peck concedes that this argument applies to the defamatory statements in the *termination letters* only. *See* Appellants' Br. 41. And by its terms, the *only* remedy afforded by Section 160A-168(d) is removal of the termination letters *from the personnel file* or placement of notes *in the personnel file*.

Here, Peck did not just place the termination letters in the Officers' personnel files; Peck disclosed the allegedly false and stigmatizing letters *to the media*. And Peck made further disclosures of false and stigmatizing statements regarding the grounds for the Officers' termination in his email to Bald Head employees. Accordingly, regardless whether Section 160A-168(d) provides constitutionally adequate process to remedy any defamatory and stigmatizing information in the Officers' personnel file, it does not provide the Officers' with *any* process to remedy the false disclosures at issue here, let alone the constitutionally mandated name-clearing hearing. *See Johnson*, 903 F.2d at 999.

\* \* \* \* \*

In sum, under clearly established law, Peck's disclosure of the allegedly false and stigmatizing termination letters and email to Bald Head employees deprived the Officers

28

of a constitutionally cognizable liberty interest. And this Court's precedent also clearly establishes that Peck did not afford the Officers due process of law because Peck did not afford the Officers a name-clearing hearing before disseminating the false and stigmatizing materials. Accordingly, we affirm the district court's denial of qualified immunity regarding the Officers' Fourteenth Amendment liberty interest claims.

## C.

Defendants next argue that the district court erred in denying their motion for summary judgment on the Officers' defamation claims. However, because the officers' defamation claims are separate from our consideration of qualified immunity, we must first confirm that we have jurisdiction over this discrete aspect of Defendants' appeal.

Unlike a denial of qualified immunity, which is immediately appealable despite its interlocutory status, *Johnson v. Fankell*, 520 U.S. 911, 915 (1997), our appellate jurisdiction is generally limited to final orders from district courts, *see Hensley ex rel. N.C. v. Price*, 876 F.3d 573, 586 n.7 (4th Cir. 2017); 28 U.S.C. § 1291. In two circumstances we may exercise our "pendent appellate jurisdiction" to consider additional issues arising from non-final orders: "(1) when an issue is inextricably intertwined with a question that is the proper subject of an immediate appeal; or (2) when review of a jurisdictionally insufficient issue is necessary to ensure meaningful review of an immediately appealable issue." *Hensley*, 876 F.3d at 586 n.7 (internal quotation marks omitted).

Defendants assert that this Court can exercise pendent appellate jurisdiction over the Officers' libel claims because those claims are "intertwined" with the district court's

qualified immunity determinations, which are properly before this Court. "Two separate rulings are 'inextricably intertwined' if the 'same specific question' will 'underlie both the appealable and the non-appealable order,' such that resolution of the question will necessarily resolve the appeals from both orders at once." *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 111 (4th Cir. 2013) (internal quotation marks omitted).

On appeal, Defendants argue that in refusing to dismiss the Officers' defamation claim "the district court erred in holding that [the Officers] offered sufficient evidence of actual malice to survive summary judgment." Appellants' Br. 50. Under the Supreme Court's decision in *New York Times v. Sullivan*, public officials—like the Officers—must prove by clear and convincing evidence that a defendant made an allegedly defamatory statement with actual malice, *i.e.*, "with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. 254, 279–80 (1964). "Actual malice is a subjective standard." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 714 (4th Cir. 1991) (en banc). Although what constitutes "[r]eckless disregard . . . cannot be fully encompassed in one infallible definition," the Supreme Court has "emphasized the necessity for a showing that a false publication was made with a 'high degree of awareness of . . . probable falsity.'" *St. Amant v. Thompson*, 390 U.S. 727, 730–31 (1968) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964)). "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* at 731.

30

Whether Defendants acted with actual malice in disclosing the termination letters and Forms F-5B and sending the email to Bald Head employees is not inextricably intertwined with the district court's denial of qualified immunity to Peck and Mitchell on the Officers' First and Fourteenth Amendment claims. In particular, resolving Peck and Mitchell's qualified immunity appeals does not require that we determine that Defendants made the allegedly defamatory disclosures with a "high degree of awareness of . . . probable falsity." *Id.* (internal quotation marks omitted). Accordingly, resolution of Peck and Mitchell's claim to qualified immunity will not "resolve the appeals from both orders at once." *Scott*, 733 F.3d at 111.

D.

Defendants' final argument is that the Officers' "prayer for injunctive relief on their liberty interest claim[s] should be dismissed as moot." Appellants' Br. 55. However, this remedies question is wholly unrelated to our qualified immunity inquiry. We therefore also lack pendent jurisdiction to consider Defendants' mootness argument. *See Rux v. Republic of Sudan*, 461 F.3d 461, 476 (4th Cir. 2006) (finding no basis for pendent jurisdiction given that "[e]ach issue involves a distinct legal concept that does not affect analysis of the other").

III.

For the foregoing reasons, we affirm the district court's denial of qualified immunity to Peck regarding the alleged due process violations and reverse the district court's determination that Peck and Mitchell are not entitled to qualified immunity

31

regarding the Officers' First Amendment claims.  Because we lack jurisdiction to consider Defendants' defamation and mootness arguments, we dismiss those aspects of Defendants' appeal.  Accordingly, we

*DISMISS IN PART, AFFIRM IN PART, AND REVERSE AND REMAND IN PART.*